**FIDELITY AND DEPOSIT COMPANY OF MARYLAND**

v.

**The UNITED STATES.**

No. 462–82C.

United States Claims Court.

March 23, 1983.

Yuri B. Zelinski, Baltimore, Md., for plaintiff.

M. Susan Burnett, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant; Douglas P. Knowles, Baltimore, Md., Army Corps of Engineers, of counsel.

## OPINION

GIBSON, Judge:

This is a suit arising under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (Supp. V 1981) (CDA),[1] which comes before the court on the defendant's motion for summary judgment. Jurisdiction in this court is based on 41 U.S.C. § 609(a)(1) (Supp. V 1981), the "direct access" provision of the CDA.[2]

For reasons appearing below, the court elects to treat defendant's motion for summary judgment as a motion to dismiss. Because this court is without jurisdiction in this matter on account of plaintiff's failure to certify its contract claim before the contracting officer, the motion to dismiss is granted.

## FACTS

The submissions of the parties, consisting of plaintiff's Petition, defendant's Motion for Summary Judgment, plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, and defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment, contain the essential undisputed evidence relied on by the court in ruling on defendant's motion, redesignated herein as a motion to dismiss.

Plaintiff, Fidelity and Deposit Company of Maryland (Fidelity), is a corporation organized under the laws of the State of Maryland, with its principal place of business located in Baltimore, Maryland. It is primarily engaged in business as a corporate surety in which capacity it underwrites various types of bonds, including, but not limited to, performance and payment bonds, on behalf of its principals.

Fidelity became the plaintiff in this action as a result of entering into a "Completion Agreement" (among others) with defendant obligating it to finish a 1977 maintenance dredging contract which its principal under a performance bond, Fred J. Miller, Inc. (Miller), had defaulted on. Upon completion of said contract and receiving payment in a sum less than the amount allegedly due, because "a mistake in . . . the measured quantities were substantially less than the actual quantities dredged," plaintiff instituted this suit on September 16, 1982, to recover $119,280.94 for additional maintenance dredging.

Fidelity's contract with defendant was the outcrop of events which began on October 21, 1977, when the Army Corps of Engineers awarded Contract # DACW31–78–C–0004,[3] to Miller[4] for the maintenance dredging of the Little Wicomico River in

1. The CDA was approved on November 1, 1978, and became effective on March 1, 1979. Its purpose is to provide for the resolution of claims and disputes relating to Government contracts awarded by executive agencies.

2. The direct access provision of § 609(a)(1) gives the contractor the option to bring suit in this court directly from an adverse decision of the contracting officer, in lieu of first appealing such decision to an agency board of contract appeals.

3. A copy of said contract was not submitted as a part of the record; however, plaintiff alleges that it provided for payment under a unit price for quantities of dredged material as measured in the field.

4. Miller is a Maryland corporation, situated in Kingsville, Maryland, and is engaged in business as a marine contractor which includes, but is not limited to, maintenance dredging.

Northumberland County, Virginia. In conjunction with said contract award, on October 28, 1977, plaintiff provided the payment and performance bonds, as surety on this project for Miller, in the penal sum of $87,-383.60.

On November 17, 1977, and in furtherance of the foregoing, Miller received notice to commence work under said contract, which was to be completed as of December 17, 1977. However, as of December 28, 1977, defendant determined that Miller had defaulted on the contract in that the dike disposal area as constructed was inadequate to accommodate all of the anticipated dredged material and no dredging had been performed as required. By reason of these perceived defaults, the defendant, on January 5, 1978, exercised its rights under Contract # DACW31–78–C–0004 and formally terminated the right of Miller to continue thereunder.

Fidelity, in its capacity as surety under the performance bond, and by virtue of the default of Miller, became liable to the defendant for completion of Contract # DACW31–78–C–0004, subject, of course, to the monetary limitations of its performance bond. In view thereof, on March 1, 1978, plaintiff entered into a "Completion Agreement" with defendant pursuant to which plaintiff became the contractor under the original contract between Miller and the defendant. The "Completion Agreement" specifically obligated plaintiff "to cause the contract to be completed pursuant to its terms," subject to the limitation of its bond, with consideration running to the plaintiff (the completing surety) from the defendant for reimbursement for its completion costs. Additionally, the "Completion Agreement" provided that plaintiff would be entitled "to all right, title and interest" of Miller (the original contractor) in and to said contract to the end that after March 1, 1978, plaintiff would be deemed to

be the contractor thereunder rather than Miller.

To perform the dredging as provided in the "Completion Agreement," [5] plaintiff retained Miller, the defaulting contractor; and after the dredging was completed, as agreed, defendant entered into a tripartite "Settlement Agreement" dated August 1, 1978, with plaintiff and Miller.

The "Settlement Agreement" delineated, *inter alia,* the extent and limitation of the rights and obligations of the signatory parties flowing from the execution of the "Completion Agreement," including the funds due the respective parties. More importantly, the parties also provided therein for a general and inclusive mutual release from all claims which they then held or might in the future hold against each other arising out of the original contract, the "Completion Agreement," the dredging work performed, and all matters incident thereto.

Following submission of a document (dated August 4, 1978) presented for final payment by plaintiff, as the contractor, plaintiff executed another document dated August 17, 1978, to the benefit of defendant, releasing it "from all claims and demands whatsoever arising under or by virtue of said contract, except as follows: (if none, so state.) None."

Inasmuch as the amount ultimately paid plaintiff by defendant for effecting the "Completion Agreement" was less than the amount that plaintiff now contends it was owed, stemming from some additional unidentified dredging which was necessary to complete the contract according to its terms, plaintiff commenced the filing of a claim with the contracting officer. In that connection, on or about September 18, 1980, as contended by plaintiff, Miller, *on behalf of plaintiff,*[6] forwarded what purported to be five separate claims, arising out of the

5. The fact is undisputed that as of December 28, 1977, following the originally stipulated completion date of December 17, 1977, and just prior to the January 5, 1978 default date, no dredging had been performed by Miller under Contract # DACW31–78–C–0004.

6. The letter of September 18, 1980, containing the subscribed name of Miller has no addressee reflected thereon. Defendant does not dispute plaintiff's assertion that Miller forwarded said claims on behalf of plaintiff to the proper authority.

work which it performed (between March and August 1978) on the aforesaid dredging project, to the contracting officer. In short, said claims were seeking appropriate compensation for the additional dredging occasioned by an alleged erroneous survey which caused Miller to dredge significantly larger quantities of silt then had been con-* templated under the original 1977 contract.

The contracting officer apparently did not accept these claims from Miller presumably because Miller was not then the contractor pursuant to the "Completion Agreement."[7] As a consequence, plaintiff forwarded to the contracting officer by transmittal letter dated January 8, 1981, the paperwork previously submitted by Miller requesting him to revise the amount of payment under the contract to reflect the actual quantities dredged.

Plaintiff's January 8, 1981 letter made the following pertinent statements:

"You will please find enclosed the *claim* of Fred J. Miller, Inc., for extra costs incurred in the performance of the work on the Contract DACW31–78–C–0004 also known as maintenance dredging, Little Wicomico River, North Thumberland [sic] County, Virginia. *The additional claim is for an amount of $119,280.94.* The associated facts whereby these costs were derived are attached in the folder." [Emphasis supplied.]

The "associated facts . . . attached in the folder" consisted of Miller's September 18, 1980 signed letter (with no addressee) to which were attached twelve (12) pages of what purported to be supporting factual detail. Interestingly, Miller's September 18, 1980 letter commenced by stating:

"Attached is our *Claim* pursuant to previous correspondence, for extra costs incurred in our performance of work . . . . *"The amount of the Claim is $119,280.94.* The associated facts whereby these costs

were derived are attached hereto." [Emphasis supplied.]

The first page of the 12 pages of supporting documentation attached to the letter was a table of contents as follows:

"1. Conclusions of *Claim*
2. Basis of *Claim*
3. Claims: 1 thru 5
    1. Delays by Owner and undue termination
    2. Errors in Owner's survey and plans
    3. Rejection by Owner of conforming work
    4. Defective specification
    5. Costs associated with extra work
4. Appendix and Attachments[8]
    1. Plotted soundings
    2. Calculation of dredged quantities
    3. Survey notes."
[Emphasis supplied.]

Perusal of the documentation discloses that the sections styled "Conclusions of Claim" and "Basis of Claim" are comprised of factual recitations which plaintiff claimed entitled it to the monetary relief sought. Section 3 is divided into the various subsections detailed in the table of contents with some slight variation in the subsection headings as follows:

—CLAIM # 1 Delay by Owner in issuance of notice to proceed. Termination for default without proper consideration of delays. ·
—CLAIM # 2 Errors in Survey
—CLAIM # 3 Rejection of Dike Section. (Rejection of Confirming Work)
—CLAIM # 4 Inadequate Disposal Area (Defective specification or practical impossibility of performance within specified time limits)
—CLAIM # 5 Costs.

Each subsection thus labelled contains data supporting each of the purportedly individual five claims. However, no specific dollar demands are assigned to Claims # 1

---

**7.** Subcontractors are not included in the definition of "contractor" in the CDA, 41 U.S.C. § 601(4) (Supp. V 1981). The Senate Report on the CDA explicitly considers and explains the reasons for this exclusion. S.Rep. No. 95–1118, 95th Cong., 2d Sess. 16–17, *reprinted in*

1978 U.S.Code Cong. & Ad.News 5235, 5250–51.

**8.** The Appendix and Attachment portions of the supporting data are not part of the record here.

through # 4. In marked contrast to these, Claim # 5 alone reflects the total costs which plaintiff is now claiming the defendant owes it as a result of the extra work. This claim appears as follows:

### CLAIM # 5

Costs

Claim # 1

| | | |
|---|---|---:|
| | Legal Fees of Bonding Co. | $ 1,350.00 |
| | Liquidated Damages | 13,875.00 |
| | Attorney Fees | 3,400.00 |

Claim #2 & #3

| | | |
|---|---|---:|
| | Additional Diking 6473 yds. @ 1.00 / yd. | 6,473.00 |
| | Additional Maintenance of Dikes 10,527 c.yd. @ 1.00 | 10,527.00 |
| | Additional Dredging | |
| | Paid 27,473 yds. | |
| | Dredged 33,960 yds. | |
| | 6,487 yds. @ 2.89/yd. | 18,747.43 |

Claim #4

| | | |
|---|---|---:|
| | Additional Costs of Pumping 33,960 yards at reduced rate 2.89 x .50 = 1.45/yard | 49,242.00 |
| | Interest on Claims #1, #2, & #3 | |
| | 54.372.00 x 12.5% = 61,169.00 | |
| | 61,169.00 x 14.5% = 70,038.51 | |
| | — 54,372.00 | |
| | | 15,666.51 |

Amount of Claim  $119,280.94

As can be seen, of the alleged five "claims," contained in the supplementary documentation to the Miller letter of September 18, 1980, and attached to plaintiff's transmittal letter of January 8, 1981, Claim # 5 is plaintiff's *only assertion and demand for the payment of a sum certain alleged to be due* as a result of extra costs incurred in the performance of the work on dredging contract # DACW31-78-C-0004. It alone accords with the summary demand for the payment of a sum certain as underscored above in the quotations from the letters.

The contracting officer responded to the foregoing submissions by letter dated April 28, 1981, denying relief and advising plaintiff that the 1977 and 1978 surveys relative to the contract were correct; that no error could be found in them; and that inasmuch as all of the parties executed a release, plaintiff's claim could only be considered if there were evidence of collusion, fraud, or mutual mistake, and none of these was present.[9]

Shortly following the receipt of the April 28, 1981 response from the contracting officer, plaintiff forwarded a reply letter to him dated May 28, 1981, to which was attached a letter of complaint written by Miller which plaintiff adopted as its own. Plaintiff stated, in its own cover letter, *inter alia,* that "the decision made by yourself on April 28, 1981 is being appealed." The contracting officer's reply letter to the foregoing, dated September 8, 1981 advised plaintiff that "there was no decision by the Contracting Officer which can be appealed." Additionally he stated that since there was no evidence of collusion, fraud or mutual mistake, the claim could not be considered by his office.

Plaintiff, in view of the foregoing, considered said letter as a 41 U.S.C. § 605(c)(5) (Supp. V 1981) "deemed ... decision" by the contracting officer denying its claim and filed suit in this court on September 16, 1982.[10]

### Parties' Contentions

Against the foregoing background, defendant does not dispute the factual allega-

---

**9.** It is noted that the contracting officer's letter dated April 28, 1981, denying the foregoing claim for relief was responsive to the claim filed on January 8, 1981.

**10.** In plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment it is stated that the September 8, 1981 letter was *received* on September 18, 1981; however, in the Petition at paragraph 9, plaintiff contends that it was received on September 16, 1981. The pertinence of the foregoing is that a direct access suit pursuant to 41 U.S.C. § 609(a)(3) (Supp. V 1981) *must* be filed within 12 months from the date of the *receipt* by the contractor of the decision by the contracting officer. Defendant has not raised the discrepancy in dates as a timeliness issue. Also, the first "decision" issued was dated April 28, 1981, and the second September 8, 1981. Obviously, the first "decision" was received prior to September 16, 1981. Perhaps defendant considered plaintiff's May 28, 1981 letter as a request for reconsideration and the contracting officer's September 8, 1981 response as the § 605(c)(5) "deemed ... decision" into which the April 28, 1981 response was merged.

tions in plaintiff's petition and contends that it is entitled to judgment for two reasons:

   (i) this court lacks jurisdiction to hear this petition because plaintiff failed to properly certify its claim as required by the CDA, 41 U.S.C. § 605(c) (Supp. V 1981) and

   (ii) plaintiff is barred from recovery on its claim by two separate releases it executed in 1978.

Implicit in ground (i) is defendant's contention that plaintiff's claim is unitary in an amount in excess of $50,000, thus triggering the certification requirements.

Plaintiff counters by asserting the following:

   (i) the claim certification requirements of 41 U.S.C. § 605(c)(1) do not apply because plaintiff has submitted five separate claims, none of which exceeds $50,000;

   (ii) summary judgment is inappropriate in the instant case because although certain basic facts respecting the claims submitted by plaintiff are not in dispute, a dispute does exist as to the interpretation of those facts and the inferences which may be drawn from them;

   (iii) the settlement agreement and release entered into by the parties dated August 1, 1978, whereby plaintiff purportedly released defendant from all claims arising out of the dredging contract, should be modified on account of a mutual mistake of material facts by the contracting parties and, in any case, summary judgment is inappropriate since genuine issues of material fact exist concerning the August 1, 1978 agreement; and

   (iv) the second release entered into by the parties on August 17, 1978, was

**11.** Defendant has in fact not filed an Answer (responsive pleading) to plaintiff's Petition, so it appears that its Motion for Summary Judgment is intended to set forth the Government's defenses in lieu of an Answer as provided in Rule 12(b).

without consideration and redundant in view of the August 1, 1978 agreement and is therefore a nullity and is without force and effect.

### DISCUSSION

   ■■■ As a threshold matter, the court will consider its treatment of defendant's motion for summary judgment under RUSCC 56 as a motion to dismiss under Rule 12(b). It is apparent that the principal ground on which defendant bases its motion is this court's lack of subject matter jurisdiction. Lack of subject matter jurisdiction is a "matter in abatement" and when a court dismisses a case on that ground, it should not also adjudicate the merits of the case. The granting of a motion for summary judgment is a disposition on the merits of the case, however, and results technically in a judgment in bar of the plaintiff's claims. 6 J. Moore, Moore's Federal Practice ¶ 56.03 (2d ed. 1982). *Stanley v. Central Intelligence Agency,* 639 F.2d 1146, 1157 (5th Cir.1981). Thus, the jurisdictional issue should properly be raised by a motion to dismiss, or in a responsive pleading, and not by a motion for summary judgment.[11] J. Moore, Moore's Federal Practice ¶ 56.03.

   ■■■ The court notes that defendant's alternative ground for judgment in its favor, the argument concerning releases executed by the parties, raises legal issues which might properly be the subject of a Rule 56 motion provided no genuine issues of fact existed concerning it. Since we will not reach the issues raised in that second argument, but, as will appear below, must rest our decision on the jurisdictional argument, the court deems it appropriate to treat the defendant's motion as a motion to dismiss under Rule 12(b)(1) rather than one for summary judgment.[12] *See Meench v. Ray-*

**12.** This court, like the Court of Claims before it, is a court of limited jurisdiction, *see Soriano v. United States,* 352 U.S. 270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1957), and a federal court must dismiss a suit over which it has no jurisdiction. *Stanley v. Central Intelligence Agency,* 639 F.2d 1146, 1157 (5th Cir.1981). RUSCC 12(h)(3) appropriately provides that "[w]henev-

*mond Corp.,* 283 F.Supp. 68, 69 (E.D.Pa. 1968).

We now turn to the principal issue presented, *i.e.,* whether the court has jurisdiction in this case even though plaintiff did not certify its claims to the contracting officer. In this connection, 41 U.S.C. § 605(c)(1) (Supp. V 1981) provides as follows:

"A contracting officer shall issue a decision on any submitted claim of $50,000 or less within sixty days from his receipt of a written request from the contractor that a decision be rendered within that period. For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable." [13] [Emphasis supplied.]

The point of departure between the litigants herein, therefore, is simply—whether the submissions by plaintiff to the contracting officer detailed above constituted a claim of more than $50,000 within the foregoing *underscored* statutory provisions of the CDA. Stated another way, the question is whether plaintiff's submissions constituted (a) multiple claims each of which aggregated $50,000 or less, or (b) whether said submissions constituted a *unitary* claim in excess of $50,000. If the *former obtains*, then, of course, certification is not required. Conversely, if the submission is within said underscored provisions, then the claim, as filed, should have been certified. Otherwise, "there is simply no claim that this court may review under the Act" inasmuch as certification of a claim pursuant to 41

U.S.C. § 605(c)(1) is a jurisdictional prerequisite to a direct access challenge in this court of a contracting officer's decision. *Paul E. Lehman, Inc. v. United States,* 230 Ct.Cl. ——, ——, 673 F.2d 352, 355 (1982); *see also W.H. Moseley Co. v. United States,* 230 Ct.Cl. ——, ——, 677 F.2d 850, 852 (1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982); *Skelley & Loy v. United States,* 231 Ct.Cl. ——, ——, 685 F.2d 414, 417 (1982).

While the CDA does not define the word "claim" or "claims," the administrative regulations in this case implementing the CDA [14] define "claim" for purposes of the CDA as follows:

"... 'claim' means *a written demand* on one of the contracting parties *seeking,* as a matter of right, *the payment of money,* adjustment or interpretation of contract terms, or other relief, arising under or related to the contract. However, a written demand by the contractor seeking the payment of money in excess of $50,000 is not a claim unless or until certified...." [Emphasis supplied.]

It is emphasized that the foregoing regulation defines, as is apparent, the *singular* rather than the *plural* form of the noun "claim." Thus, a contractor's written demand for the payment of $50,000 or less (or other relief) constitutes a "claim" within the meaning of the CDA, whereas a written demand for more than $50,000 constitutes a "claim" only when it is properly certified.

■ Here, the undisputed facts make it abundantly clear to this court that the bundle of documents submitted by plaintiff to the contracting officer constituted a *single* written demand for a payment well in excess of $50,000 arising out of the Comple-

---

er it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." *See O'Donnell v. Wien Air Alaska, Inc.,* 551 F.2d 1141, 1144–45 n. 3 (9th Cir.1977). As a technical matter, we have altered the designation of defendant's pending motion to reach the required result, which is essentially the same as dismissing the action *sua sponte* under Rule 12(h)(3).

**13.** 41 U.S.C. § 604 (Supp. V 1981) provides sanctions if a contractor is unable to support any part of his asserted claim where the inability is attributable to misrepresentation or fraud. He shall be liable in an amount equal to the unsupported part of the claim plus applicable costs.

**14.** DAR (ASPR) 1–314(b)(1), 32 C.F.R. 1–314(b)(1) (1981).

tion Agreement of March 1, 1978, plaintiff's contract with the Government.

Plaintiff rather ingenuously, but tortuously, presses on the court the argument that its package of submissions to the contracting officer constituted five separate claims arising out of the work it performed on the dredging project. Those submissions do include, as noted above, narrative summaries arranged as purportedly individual and separate "claims" under the headings "Claim # 1, # 2," etc. The court's careful analysis of those documents, however, leads inescapably to the conclusion that they merely provide supporting data justifying what was essentially a single demand for $119,280.94 under the contract. It is also particularly noteworthy in this regard that the Miller letter of September 18, 1980, states that "[t]he amount of the Claim [singular] is $119,280.94," and in plaintiff's own letter of January 8, 1981, reference is made to the "additional claim [singular] . . . for an amount of $119,280.94." Both letters clearly establish that plaintiff and Miller themselves dealt with their package of demands in terms of a single claim.

The statutory requirement that claims in excess of $50,000 be certified as to accuracy, completeness, and the contractor's good faith, together with 41 U.S.C. § 604 that imposes sanctions for fraudulent claims, constitute the design framed by Congress to deter and resolve the serious problems caused by contractors filing inflated and unsupportable claims. *See Paul E. Lehman, Inc. v. United States*, 230 Ct.Cl. ——, 673 F.2d 352, 354 (1982).

Admiral Rickover was the prime mover of the certification provisions before the Congress. At hearings on the CDA on June 14, 1978, he advised that the new law should:

"[r]equire as a matter of law that prior to evaluation of any claim, the contractor must submit to the Government a certificate signed by a senior responsible contractor official, which states that the claim and its supporting data are current, complete and accurate. In other words, you put the contractor in the same posi-

tion as our working man, the income tax payer who must certify his tax return. . . ."

Contract Disputes Act of 1978: Joint Hearings on S.2292, S.2787 & S.3178 Before the Subcomm. on Federal Spending Practices and Open Government of the Senate Comm. on Governmental Affairs and the Subcomm. on Citizens and Shareholders Rights and Remedies of the Senate Comm. on the Judiciary, 95th Cong., 2d Sess. 21 (1978).

The Court of Claims cited this testimony in *Paul E. Lehman, Inc.* and commented notably on the legislative history of the CDA:

"Admiral Rickover wanted to deter contractors from filing inflated claims which cost the Government substantial amounts to defeat. He sought to do so by subjecting contractors to financial risk if their claims were unreasonable. . . . [He] viewed the certification requirement as a necessary prerequisite to the consideration of any claim. The provisions Congress adopted to include the certification requirement were based upon Admiral Rickover's written suggestions and fairly must be deemed to have incorporated his view concerning the effect of the certification requirement. [citing *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 31–32, 102 S.Ct. 821, 830–31, 70 L.Ed.2d 792 (1982)] . . . .

"The import of the language of the Act and its legislative history is that unless a claim has been properly certified, it cannot be considered under the statute. . . . . Unless that requirement is met, there is simply no claim that this court may review under the Act."

*Id.* at ——, 673 F.2d at 355.

The *Paul E. Lehman, Inc.* court also repeated the general rule that the construction of the statute by those charged with administering it is persuasive and noted with approval that the Armed Services Board of Contract Appeals had held on numerous occasions that a claim could not be considered unless it was certified. The court also found that current and then proposed federal regulations were of like ef-

fect. *Id.* (citing *e.g., Newell Clothing· Co.,* 80–2 BCA ¶ 14,774 (1980); *Harnischfeger Corp.,* 80–2 BCA ¶ 14,541 (1980); *Allied Materials & Equipment Co.,* 80–1 BCA ¶ 14,340 (1980); DAR (ASPR) § 1–314(b)(1), 32 C.F.R. 1–314(b)(1) (1981); FAR § 33.001, 46 Fed.Reg. 9669 (1981) (proposed)).

Plaintiff has fragmentized its demand into multiple claims for no apparent reason other than to attempt to escape the certification requirements of § 605(c)(1), and possibly other provisions of the CDA.[15] Since Congress had a valid and legitimate legislative purpose for including the certification requirements in the CDA, this court would consider it to be an affront to the legislative process if it were to rule, on the undisputed facts herein, that plaintiff has filed five separate claims.

In responding to defendant's motion as one for summary judgment, plaintiff admits that "the basic facts concerning the manner and form in which the claims were submitted to the contracting officer" are undisputed. Plaintiff attempts to raise a "genuine issue of material fact" within the meaning of RUSCC 56, however, by arguing that "a dispute exists as to the interpretation of those facts and the inference which may be drawn from them," *i.e.,* that its submissions constituted multiple claims, rather than a unitary one.

█ It is so plain from the record that plaintiff's submissions to the contracting officer constituted a single claim that plaintiff's attempt to create a factual issue based on "inferences" is patently frivolous. Even if the court agreed that a "genuine" issue of material fact was present for purposes of Rule 56, this would not prohibit our ruling on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) or dismissing an action *sua sponte* for the same reason under Rule 12(h)(3). "[T]he existence of disputed material facts will not preclude [a] trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen v. First Federal ˙ Savings and Loan Association,* 549 F.2d 884, 891 (3rd Cir.1977). And the power of a federal court to make factual findings which are decisive of jurisdiction is not disputed. *See Williamson v. Tucker,* 632 F.2d 579, 588 (5th Cir.1980) (citing *Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4, 91 L.Ed. 1209 (1947)).

█ Where a factual issue is raised in connection with a jurisdictional motion (as we have characterized defendant's motion herein), the court has broad discretion as to the method to be used in resolving the factual dispute. 6 J. Moore, Moore's Federal Practice ¶ 56.03 (2d ed. 1982). "[T]he ... court is not limited to an inquiry into *undisputed* facts. It may hear conflicting written and oral evidence and decide for itself the factual issues which determine jurisdiction." *Williamson v. Tucker,* 632 F.2d at 588. [Emphasis original.][16]

We have already mentioned plaintiff's concession that the basic facts concerning its claim before the contracting officer are undisputed. These basic facts constitute, in the present posture of this case, those *jurisdictional* facts on which the court relies. The court does not believe that any "inferences" therefrom raise a *genuine* factual dispute with respect to the jurisdictional issue. For clarity of the record, nonetheless, the court does find, as a jurisdictional fact, that the carefully categorized supporting data submitted to the contracting officer, as outlined above, were part and parcel of what is basically *one* monetary demand arising out of the interrelated conduct and services provided by the contractor under a

---

**15.** Plaintiff here is the contractor with defendant under the "Completion Agreement," but originally was only the surety to the defaulting original contractor, Miller. Plaintiff's claim here is actually that of Miller, its subcontractor under the "Completion Agreement" who actually performed the work. 41 U.S.C. § 605(c)(1) provides, however, that the "*contractor* shall certify...." [Emphasis supplied.]

**16.** This is not a case where a hearing, or even additional documentary evidence would significantly clarify the jurisdictional facts. Neither party has requested either a hearing or oral argument and the court is convinced that the present record adequately apprises it of the operative facts.

single contract. More importantly, this demand insofar as dollar amount matters, is deemed to be a unitary claim for purposes of applying the "more than $50,000" test in 41 U.S.C. § 605(c)(1).

The dismissal of plaintiff's Petition herein, unlike a judgment entered on a motion for summary judgment, will have no *res judicata* effect because it does not bear on the merits. *See* 10 Wright & Miller, Federal Practice and Procedure § 2713 at 402–05 (1973). It is important to note, then, what further recourse plaintiff has to pursue a remedy under the contract here in issue. The Court of Claims in *Skelley & Loy v. United States,* 231 Ct.Cl. at ——, 685 F.2d at 419, provided guidance to plaintiffs whose direct access suits under the CDA are aborted on the jurisdictional issue, as plaintiff's is here, because of failure to certify the claim before the contracting officer. The court stated:

> "The proper course of action—for a contractor whose case is dismissed for lack of jurisdiction—is the following: (1) properly certify the claim; (2) resubmit the claim to the contracting officer; and (3) if there is then an adverse contracting officer's decision, appeal either to the [agency] board [of contract appeals] (section 606) or directly to this court (section 609)." [17]

### CONCLUSION

In view of the foregoing, the court concludes that it has no jurisdiction in this matter and cannot entertain the other issues raised and argued by the parties. Treating defendant's motion for summary judgment as a motion to dismiss, the court accordingly grants the motion and orders the clerk of this court to dismiss the plaintiff's Petition without prejudice.

IT IS SO ORDERED.

**17.** The *Skelley & Loy* court commented on what further course was available because of apparent confusion resulting from the Court of Claims' remarks in *Lehman,* 230 Ct.Cl. at ——, 673 F.2d at 356, and *Moseley,* 230 Ct.Cl. at ——, 677 F.2d at 852, both of which involved contracts entered into prior to the effective date of the CDA. The time factor bore on the remedies available to the *Lehman* and *Moseley*

plaintiffs after dismissal of their claims for failure to certify them to the contracting officer. *Skelley & Loy* involved a contract entered into after the CDA effective date, unlike this case, which is more akin to *Lehman* and *Moseley,* but the court's advice seems equally applicable to both types of cases. *See Skelley & Loy,* 231 Ct.Cl. at ——, 685 F.2d at 417–19 and notes therein.