**BLACK STAR SECURITY, INC. And Thomas Funding Corp.**

v.

**The UNITED STATES.**

No. 9–83C.

United States Claims Court.

April 6, 1984.

the hearing of October 7, 1983 were retained in virtually identical form in the 1983 Circular.

Walter D. Hansen, Washington, D.C., for plaintiffs.

George M. Beasley, III, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

## ON DEFENDANT'S MOTION TO DISMISS

### OPINION

SETO, Judge:

This contract action, arising under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601 *et seq.* (Supp. V 1981) (CDA), comes before the court on defendant's motion un-der RUSCC 12(b)(1) to dismiss for lack of subject matter jurisdiction. Defendant asserts that plaintiffs should have, but did not, comply with the certification requirements of CDA § 605(c)(1), and thus have presented no claim of which this court has jurisdiction under CDA § 609(a)(1). Plaintiffs contend, however, that they have presented five separate claims, none of which must be certified under § 605. For the reasons set forth hereinafter, the court finds that plaintiffs have presented a single, unitary claim which has not been properly certified. This court therefore lacks jurisdiction over plaintiffs' cause, and plaintiffs' complaint will be dismissed.

### FACTS

The facts as set forth herein are presented in plaintiffs' complaint, defendant's motion to dismiss, plaintiffs' response to defendant's motion, and defendant's reply. For the purposes of this motion only, defendant does not dispute plaintiffs' allegations of fact.

Plaintiff, Black Star Security, Inc. (Black Star), is a Massachusetts corporation which provides security guard services. Plaintiff, Thomas Funding Corp. (Thomas), is a financing institution organized under the laws of New York.[1] In August 1980, Black Star entered into a contract, No. 023–80–569, with the United States Department of Housing and Urban Development (HUD). According to the "Solicitation, Offer and Award" attached as Exhibit B to plaintiff's complaint, Black Star was to provide security guard services as follows:

INDEFINITE SECURITY GUARD SERVICE: Herein after [sic] described in detail at various locations within Boston, Suffolk County, Massachusetts, [sic] Service shall commence on the date specified in the Notice to Proceed and continue for

---

1. Thomas is a plaintiff herein because of its status as assignee of funds due plaintiff Black Star under the latter's contract with the Government. The complaint states that the assignment "was made pursuant to the Assignment of Claims Act, 41 U.S.C. § 15; 31 U.S.C. § 203."

For the purposes of this motion, the court assumes that the assignment is valid and enforceable. Co-plaintiffs here do not assert differing claims, and reference will be made to "Black Star" or "plaintiff."

a period of twelve (12) months at which time the contract will terminate.

Plaintiff began providing security services in September 1980.[2]

The contract was terminated in April 1981 by HUD pursuant to the contract's "TERMINATION FOR CONVENIENCE OF THE GOVERNMENT" clause.[3] At this point, the record becomes somewhat unclear. Apparently, some dispute as to wage payments arose and HUD's contracting officer withheld approximately $210,000 allegedly due Black Star under the contract.[4] After settlement or other administrative disposition, this withheld sum was reduced to $137,939.26, of which $80,357.86 was forwarded to the Department of Labor in settlement of the wage dispute.[5] Although not all of the correspondence between Black Star and HUD was attached to the various filings in this case, it is inferred from two letters that were attached to defendant's motion that HUD was concerned about the number of guard hours worked and the duties of those for whom hours were billed. For whatever reasons, HUD did not pay over to Black Star any of the disputed amounts whatsoever.

By a letter dated November 18, 1981, plaintiff's president, Victor McDonald, made a demand on HUD through its contracting officer for $146,104.18 allegedly due plaintiff for services rendered during February, March, and April 1981.[6] This letter attempted to explain certain discrepancies contained in employee affidavits required by HUD, and to explain the status of certain of Black Star's employees. On January 12, 1982, HUD's contracting officer sent a letter to plaintiff's president rejecting plaintiff's demands and explaining why the demand was being rejected. The letter also contained the following language:

> It is determined inappropriate to continue to belabor the contract issues any further. HUD will proceed to wrap up and close the contract records of this office. *This is the final decision of the Contracting Officer.* This decision may be appealed to [the] HUD Board of Contract Appeals ....
>
> *   *   *   *   *   *
>
> Instead of appealing to the Board of Contract Appeals, you may bring an action directly to the U.S. Court of Claims within twelve (12) months of the date you receive this notice. [Exhibit 1 to Affidavit of Kenneth H. Salk, attached to defendant's Motion to Dismiss] [Emphasis added].

Plaintiff chose the latter alternative mentioned in the contracting officer's letter, and a complaint was filed in this court on January 11, 1983. In lieu of an answer, defendant filed a motion for an enlargement of time, and filed its motion to dismiss the complaint on May 13, 1983. The motion was fully briefed by the parties, but thereafter, counsel for plaintiff filed a mo-

---

**2.** Although the contract attached to plaintiff's complaint as Exhibit B calls for guards to be provided at four locations, *viz.,* Academy Homes, Charlame Park, Methunion Manor, and Warren Gardens, plaintiff's brief in opposition to defendant's motion also names a fifth location, 15 Nottingham Street, at which guards were supplied. Although this discrepancy was not addressed by either party, it appears from certain documents that the fifth location was added by a separate contract, No. 023–80–570.

**3.** Plaintiff does not contest the propriety of that termination in this action.

**4.** A portion of the contract contains provisions from the Service Contract Act of 1965, 41 U.S.C. § 351, as implemented by Part 4 of Title 29 of the Code of Federal Regulations. Paragraph (h) of that portion of the contract states in pertinent part:

> The contracting officer shall withhold or cause to be withheld from the Government prime contractor ... such sums as he, or any appropriate officer of the Labor Department, decides may be necessary to pay underpaid employees. [Exhibit B of plaintiff's complaint.]

**5.** Plaintiff does not contest the disposition of the wage dispute.

**6.** This sum was apparently derived from the $210,000 originally demanded by plaintiff, but the briefs were silent regarding how this sum was determined. In any event, the sum eventually demanded by plaintiff (before the wage dispute set-off) was $137,939.26.

tion for leave to withdraw as counsel. Because of its possibly adverse effect on plaintiff's claim, *see* RUSCC 81(d)(6) (second sentence), a ruling on this latter motion was deferred pending the instant decision on defendant's motion.

### Parties' Contentions

In its complaint, plaintiff asserts that this court has jurisdiction over this action under 28 U.S.C. § 1491 and 41 U.S.C. §§ 601–613 (*viz.*, the CDA). Although plaintiff's non-specific reference is to the CDA *in toto*, the statute granting this court jurisdiction over disputes brought under the CDA's provisions is § 609(a):

(a) Actions in United States Claims Court; district court actions; time for filing

(1) Except as provided in paragraph (2), and in lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Claims Court, notwithstanding any contract provision, regulation, or rule of law to the contrary.

(2) [Inapplicable herein.]

(3) Any action under paragraph (1) or (2) shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim, and shall proceed de novo in accordance with the rules of the appropriate court.

Plaintiff asserts that it fully performed according to the terms of the contract while the contract was in force, that it duly submitted periodic invoices for each payroll period, and that these invoices "were accompanied by applicable executed and certified Government forms WH–347 covering the period of security service performance for which the invoices were submitted." Complaint, ¶ 9. Paragraph ten of the complaint alleges that plaintiff is owed "$57,-581.40 which is the difference between the total due of $137,939.26 less $80,357.86 that was allegedly forwarded to the United States Department of Labor for the settlement of wage payment disputes." Finally, the complaint demands "judgment ... against the United States of America in the amount of $57,581.40, ...."

Defendant's motion to dismiss asserts that this court has no jurisdiction of the subject matter of plaintiff's cause. This contention is based on straightforward statements of fact and law: (1) the CDA requires that all demands for over $50,000 be certified by the contractor to the contracting officer, 41 U.S.C. § 605(c)(1); (2) plaintiff has not certified its claim, ¶ 5, Affidavit of Kenneth H. Salk, HUD Boston Area Office Contracting Officer; and (3) the Court of Claims has held that certification is a jurisdictional prerequisite to a suit brought under the CDA, *Paul E. Lehman, Inc. v. United States*, 230 Ct.Cl. 11, 673 F.2d 352 (1982). Thus, it is argued, this court must dismiss for want of jurisdiction.

In response to this argument, plaintiff argues alternatively that either (1) plaintiff's claims under § 605(c)(1) actually consist of the periodic vouchers submitted during the term of the contract, none of which vouchers exceeded $50,000 in value; or (2) plaintiff has stated a separate claim for each of the five locations at which guard services were provided and none of the five separate claims exceed $50,000 after the set-off for wage payment disputes. Plaintiff asserts that the individually certified forms WH–347 (used to report to HUD the number of guard hours performed) constitute sufficient certification for purposes of the CDA. Plaintiff claims that, in any event, the sole reason that the aggregate amount of its demand in this court exceeds $50,000 is that defendant refused to honor valid periodic claims. Because these refusals were improper, it is asserted, defendant should not now be allowed to erect a barrier to recovery which was created by its improper actions.

Defendant rejoins that plaintiff, having at all times prior to defendant's motion treated its demand as a single amount, cannot now circumvent its failure to certify by dividing this single amount into sepa-

rate components. Defendant further contends that, even if the claim does consist of smaller components, these components are so closely related in fact as to be only the supporting data for what is in reality a single demand. Therefore, assertedly, certification is still required, and plaintiff's failure to certify its claim is not remedied by its arguments.

### DISCUSSION

### I

Section 605(c)(1) states:

A contracting officer shall issue a decision on any submitted claim of $50,000 or less within sixty days from his receipt of a written request from the contractor that a decision be rendered within that period. *For claims of more than $50,-000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.* [Emphasis added.]

In the five and a half years since the enactment of the CDA, this court and its predecessor have had occasion to address this section frequently.

The leading Court of Claims case in which the history and purposes of § 605 were considered is *Lehman, supra.* The court emphasized that section as "an important part of the new procedures Congress provided in the [CDA] for the handling of claims by government contractors." 230 Ct.Cl. at 14, 673 F.2d 352. The court went on to say:

"The purposes of the certification requirement are to discourage the submission of unwarranted contractor claims and to encourage settlements." *Folk Construction Co. v. United States,* [226 Ct.Cl. 602, 604 (1981)] (order entered

January 16, 1981). The importance Congress attached to the certification requirement is reflected not only in section [605(c)(1)], which states that the contractor "shall" certify, but also in the provision in section [605(c)(2)] that the contracting officer's obligation within 60 days to issue a decision or inform the contractor when he will do so arises only after the officer has received a "certified claim." [230 Ct.Cl. at 14, 673 F.2d 352.]

The purposes and importance of § 605 were also noted in *Skelly and Loy v. United States,* 231 Ct.Cl. 370, 376 n. 11, 685 F.2d 414, 418 n. 11 (1982): "In brief, certification plays a serious role in the statutory scheme because it triggers a contractor's potential liability for a fraudulent claim under section 604 of the [CDA]."

Having considered the importance of the certification requirement, and having reviewed the content and weight of Admiral Rickover's testimony concerning the certification requirement [7], the court in *Lehman* concluded:

The import of the language of the [CDA] and its legislative history is that unless a claim has been properly certified, it cannot be considered under the statute. As we said in *Folk,* "The statute thus requires that to be valid a claim must be properly certified." Unless that requirement is met, there is simply no claim that this court may review under the [CDA]. [230 Ct.Cl. at 16, 673 F.2d 352.]

This holding was repeated in *W.H. Mosely Co., Inc. v. United States,* 230 Ct.Cl. 405, 406, 677 F.2d 850 (1982) ("certification of a claim [under § 605 of the CDA] is a jurisdictional prerequisite to a direct challenge in this court of a contracting officer's decision") and *Skelly and Loy, supra,* 231 Ct.Cl. at 372, 685 F.2d at 416 ("a claim over $50,000 is not a valid claim and cannot be entertained by this court unless it has been certified"). More recently, this holding has been reaffirmed by the Court of Appeals

---

7.  *See, Contract Disputes Act of 1978: Joint Hearings on S. 2292, S. 2787 & S. 3178 Before the Subcomm. on Federal Spending Practices and Open Government of the Senate Comm. on Gov-* *ernmental Affairs and the Subcomm. on Citizens and Shareholders Rights and Remedies of the Senate Comm. on the Judiciary,* 95th Cong., 2d Sess. 21 (1978).

for the Federal Circuit in *W.M. Schlosser Co., Inc. v. United States*, 705 F.2d 1336, 1337–1338 (Fed.Cir.1983).

■ The cases cited above clearly establish the procedural elements necessary to this court's jurisdiction over a direct suit under the CDA: (1) the claim must be certified *before* commencing a direct court action, *Mosely, supra* at 408, 677 F.2d 850; (2) the certification must be in writing, *Skelly and Loy, supra*, 231 Ct.Cl. at 373, 685 F.2d at 416; (3) the submitted certification must set forth all of the elements required by § 605; and (4) the certification cannot be made in a piecemeal fashion, *Mosely, supra* at 407, 677 F.2d 850.

## II

The jurisdictional and procedural elements of the certification requirement having been firmly established, it is necessary to address the problem of the number and value of the claims being presented for disposition by this court. Plaintiffs faced with dismissal for failure to certify have attempted to restructure their claims so as to present several claims, each for less than $50,000, rather than a single claim exceeding that amount. It is instructive to note how the judges of this court have treated these attempts to avoid the certification requirement.

In *Fidelity and Deposit Co. of Maryland v. United States*, 2 Cl.Ct. 137 (1983) [GIBSON, J.], plaintiff, as surety for a contractor on a dredging contract, presented what purported to be five different claims, the total demand for which was $119,280.94. The last of these five "claims" was merely a tabulation of the amounts allegedly due plaintiff for the first four items. After reviewing several of the cases cited hereinabove, Judge Gibson stated:

Plaintiff rather ingenuously, but tortuously, presses on the court the argument that its package of submissions to the contracting officer constituted five separate claims arising out of the work it performed on the dredging project. Those submissions do include, as noted above, narrative summaries arranged as purportedly individual and separate "claims" under the headings "Claim # 1, # 2," etc. The court's careful analysis of those documents, however, leads inescapably to the conclusion that they merely provide supporting data justifying what was essentially a single demand for $119,280.94 under the contract. It is also particularly noteworthy in this regard that the Miller letter of September 18, 1980, states that "[t]he amount of the Claim [singular] is $119,280.94," and in plaintiff's own letter of January 8, 1981, reference is made to the "additional claim [singular] ... for an amount of $119,280.94." Both letters clearly establish that plaintiff and Miller themselves dealt with their package of demands in terms of a single claim. [2 Cl.Ct. at 144.]

Based on this analysis, the court held that the plaintiff had actually presented a single, unitary claim for over $50,000 and, because plaintiff had not certified the claim as required by § 605, the court had no jurisdiction.

A similar attempt was made by the plaintiff in *Warchol Construction Co. v. United States*, 2 Cl.Ct. 384 (1983) [LYDON, J.]. Plaintiff had contracted with the United States Postal Service to build a new postal facility in Illinois. It first sought a change order and a time extension in September 1979 for what it believed was a differing site condition. The amount claimed was $46,719. Shortly thereafter, it submitted a second such request, the amount of which was later determined to be $8,259.65, for hauling excess dirt away from the building site. These requests were denied by the contracting officer in January 1980. In April 1980, plaintiff submitted a third request for a change order, in the amount of $13,235, for the additional costs of paving due to the delay caused by the differing site conditions. No contracting officer's decision was rendered on this last request. Because the completion of the contract was late, the Government assessed plaintiff $99,000 in liquidated damages. Plaintiff sued for the amounts noted above in two

counts: the first count concerned the change order requests, and the second count sought the liquidated damages withheld.

The court, after reviewing the *Fidelity* decision, *supra*, stated:

What is important is that both *Fidelity* and this case involved a single, unitary claim based on a common and related set of operative facts which gave rise to damage claims which the contractors sought to fragmentize into separate and distinct claims resulting, intentionally or otherwise, in certification avoidance.

The concept of what constitutes a "claim" has proved troublesome in various contexts. In the context of the certification requirement, where the components of a unitary claim ... are so related to one another that they form parts of a whole, they ought to be considered together when determining whether certification is required. [2 Cl.Ct. at 389] [Citation omitted.]

The fact that plaintiff had submitted one portion of its claim for differing site conditions to the contracting officer did not help plaintiff in that case. The court held that the claims were so closely related that plaintiff's actions in submitting the one claim for consideration was premature. Because of the importance of the certification requirement, plaintiff's proper course of action, according to Judge Lydon, was as follows:

When plaintiff's differing site condition claim grew to an amount in excess of $50,000, plaintiff was required to certify the entire claim. This obligation to certify existed, once it became apparent that the claim would most probably exceed $50,000, even if plaintiff may have been unaware of the extent of the additional damages at the time it submitted its initial differing site condition claim for the then known damages in the amount of $46,719.79. [*Id.* at 391.]

On the issue of liquidated damages, the court rejected plaintiff's contention that the total amount did not require certification. Plaintiff argued that the requests for time extensions were requests for time, not for money, and that each such request would have been worth less than $50,000 in any event. The court noted, however, that in plaintiff's complaint and during plaintiff's meetings with the contracting officer, plaintiff had treated the amount as a single claim. Plaintiff was therefore not allowed to later fragmentize its claim to avoid the certification requirement.

*Walsky Construction Co. v. United States*, 3 Cl.Ct. 615 (1983) [WOOD, J.], is yet another case wherein the plaintiff attempted to fragmentize its claims in order to avoid the certification requirement. In that case, plaintiff presented claims for "non-warranty repair work," other repair work, and for an amount withheld by defendant pending defendant's receipt of certain "as-built" drawings. Each of these claims was for less than $50,000. In considering whether or not certification was required, Judge Wood noted:

In determining whether separately stated claims are to be deemed unitary for certification purposes, neither the language employed by the contractor in making them, nor how they are organized, governs. What is vital is whether the demands arose out of essentially interrelated conduct and services, and the same or closely connected facts. Where these factors coincide, the demands can properly be viewed as a single, unitary claim requiring certification if in the aggregate amounting to more than $50,-000. [3 Cl.Ct. at 619.]

The court held that the two repair work claims were so closely related as to constitute a single claim, for which certification was required. The third claim (for the "as-built" drawings) was, in contrast, found to be factually distinct from the other two claims and, because the amount sought did not exceed $50,000, the court properly had jurisdiction of that claim.

### III

■ In the case at bar, plaintiff has also belatedly attempted to fragmentize its claim. From the documentary record of

this case, it is clear that plaintiff treated its claim as a single one until the filing of defendant's motion to dismiss. In a letter to the contracting officer, written on November 18, 1981, plaintiff's president wrote: "We were distressed and shocked to hear from you that your agency now refuses to pay the $146,104.18 which after months of negotiation and work was distilled down from $210,000 actually due us .... We are hereby requesting immediate payment of the agreed $146,104.18." Furthermore, in the complaint, plaintiff shows the "Total amount due and owing" as "$57,581.40 which is the difference between the total due of $137,939.26 less $80,357.86 ...."

Copies of invoices and vouchers, submitted by plaintiff with its response to defendant's motion, make it quite clear that the operative facts underlying plaintiff's claim are of one kind. The sole service which plaintiff was to perform and for which it now seeks compensation was "guard service." Contrary to plaintiff's contention, the fact that the services were performed at different locations throughout the city of Boston is of no import. Were plaintiff's logic to be followed, the court would be faced with the *reductio ad absurdum* that plaintiff could posit a separate claim for each guard post within each building, or even for each hour of service performed. Such logic is an affront not only to common sense, but also to the stated purposes of the certification requirement.

■ Plaintiff's argument, that its demand exceeds the $50,000 boundary only because of defendant's refusal to pay and that, therefore, plaintiff should not be made to suffer the consequences, also fails, particularly in view of the persuasive reasoning in *Warchol*. The total amount demanded by plaintiff accumulated over a period of at least three months. Once plaintiff realized, or was able to clearly

foresee, that the amount in question might rise above $50,000, plaintiff was under a duty to certify its demand to the contracting officer.[8]

Plaintiff's reference to *B.D. Click Co., Inc.*, 81-2 BCA ¶ 15,394, page 76,260 (ASBCA Sept. 21, 1981), is inapposite. There, the Armed Services Board of Contract Appeals decided, on the facts presented to it, that the plaintiff's claims therein were separable because "[e]ach item is an independent dispute concerning contractual rights and is not intertwined in the merits of any of the other requests for equitable adjustment." *Id.* at page 76,264. In the case at bar, the antithesis is true—each "item" is subject to the same dispute over the same contractual right, and is not only "intertwined in the merits of ... the other requests," but is part and parcel of the "other requests."

■ Plaintiff also attempts to persuade the court that, because the vouchers it submitted to defendant concerning the number of guard hours performed were certified, this certification should satisfy the requirements of § 605. This argument, too, fails. *Mosely* and *Skelly and Loy* clearly hold that certification is satisfied only when (1) the contractor certifies (2) to the contracting officer (3) in writing and (4) in a single submission that (5) the claim is made in good faith, (6) the supporting data are accurate and complete, and (7) the total amount accurately reflects that for which the contractor believes defendant is liable. There is no evidence that the vouchers submitted by plaintiff satisfy any of these criteria except number "(3)." This is patently insufficient for purposes of the CDA. Plaintiff cites *Federal Electric Corp.*, 82-2 BCA ¶ 15,862, page 78,631 (ASBCA June 14, 1982) as supporting the proposition that "Precedent supports treating each of plaintiffs' voucher submissions ... as separate claims under the CDA when such claims are not acted upon, one way or the other,

---

**8.** Such certification would not only satisfy the CDA's purpose of triggering § 604 in the event of an unjustifiably inflated claim, it would also give the parties involved early notice of a seri-

ous dispute, which would simultaneously encourage a possible settlement of the claim and build a clear record for later negotiations or other actions.

**118**

by defendant's contracting officer within a reasonable time." This statement overlooks the fact that the Armed Services Board of Contract Appeals in that case was considering a different question, and indeed later stated "We accordingly conclude that the invoice of 13 March 1979, *having been properly certified,* was a claim cognizable under the Contract Disputes Act ...." *Id.* at page 78,655 [Emphasis added.]

In this case, plaintiff has submitted a single, unitary claim for over $50,000 based on a common nucleus of operative facts. Plaintiff's attempt to fragmentize its claim into separate, smaller claims which do not require certification in order to constitute valid claims is an attempt to draw a distinction without a difference. Plaintiff's demand, simply stated, is: "X hours of service were performed, for which Y dollars are due." When "X," wheresoever performed pursuant to the contract, became great enough that "Y" amounted to over $50,000, plaintiff was required to certify its claim. Failure to do so is fatal to this court's jurisdiction. Plaintiff is adverted to the remedial measures outlined in *Skelly and Loy, supra,* 231 Ct.Cl. at 377, 685 F.2d at 419.

### CONCLUSION

For the reasons discussed above, this court determines that plaintiff has presented a single demand in excess of $50,000, which demand has not been certified as required by 41 U.S.C. § 605(c)(1). Accordingly, this court is without jurisdiction in this matter. Therefore, plaintiff's complaint is to be DISMISSED WITHOUT PREJUDICE. In view of this decision, the motion made by plaintiff's counsel to withdraw as plaintiff's attorney is DENIED AS MOOT.

IT IS SO ORDERED.