**CITY OF EL CENTRO, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 208–86–C.

United States Claims Court.

March 16, 1989.

James R. Kalyvas, Los Angeles, Cal., for plaintiff; J. Mark Waxman and Paul Gustav Neumann, Los Angeles, Cal., of counsel.

Stephen J. McHale, with whom were Asst. Atty. Gen. John R. Bolton, David M. Cohen and Thomas W. Petersen, Washington, D.C., for defendant.

## OPINION AND ORDER

TURNER, Judge.

The City of El Centro, California, as owner and operator of El Centro Community Hospital (ECCH), claims entitlement to compensation from the Immigration and Naturalization Service for medical care rendered to 14 illegal aliens. The aliens had been injured in an accident following a high-speed chase initiated by agents of the Border Patrol. El Centro seeks payment of $183,263.64 in medical bills, plus interest, under 8 U.S.C. § 1252(c) and 42 U.S.C. § 249, or, alternatively, under an alleged implied-in-fact contract.

The case was tried in San Diego on December 17 and 18, 1987. At the conclusion of trial, the court found, *inter alia*, that the hospitalized aliens were *de facto* detainees of the INS. This opinion addresses issues argued in post-trial briefs and supplements the findings announced from the bench on December 18, 1987 (trial transcript pp. 257–273), which were memorialized in an order entered December 21, 1987.

The parties have briefed the issues presented by both the statutory and the contractual theories of recovery. With respect to recovery based on statute, defendant urges that there exists no Constitutional provision, statute or regulation that can fairly be interpreted as mandating compensation of plaintiff for the medical care provided in this case. With respect to the question whether plaintiff is entitled to recover under an implied-in-fact contract theory, the government asserts (1) that any contract claim in this case must be implied-in-law, not implied-in-fact, and thus outside this court's jurisdiction, and (2) that in any event the officials on whose conduct plaintiff relies to support its contract claim lacked authority to bind the government.

For reasons set forth below, the court finds that plaintiff's statutory theory does not afford a basis for recovery but that plaintiff has established an implied-in-fact contract and is entitled to recover on that basis.

## I. FACTS[1]

At approximately one o'clock on the morning of January 23, 1985, agents of the Border Patrol observed a van parked on the American side of the boundary between the United States and Mexico near El Centro, California. The van was parked at a location which was notorious to the Border Patrol as a rendezvous point for alien smugglers and persons who had crossed the border illegally. At about the same time, Border Patrol sensors indicated that a large group of persons was moving on foot in the direction of the van.

Shortly thereafter, agents observed the van leaving the area. Two Border Patrol agents followed in their cruisers, activating their red emergency lights. The driver of the van refused to stop, and a high-speed chase ensued.

After having been pursued for some distance on California's Highway 8, the van, still travelling at speeds in excess of 60 miles per hour, turned onto an exit ramp. Unable to negotiate the ramp's curve at that speed, the van vaulted over an embankment, crashed, exploded and began to burn. The two agents in pursuit quickly arrived at the crash scene, extinguished the flames, and radioed for help.

All nineteen of the persons inside the van had entered the United States illegally. The driver and two of the passengers died in the crash. Many of the survivors were grievously injured; all were unable to leave the scene under their own power. Fourteen of the aliens were taken by ambulance to El Centro Community Hospital for treatment.[2] (Trial testimony established that, were it not for their physical condition, the survivors would have immediately been taken into physical custody and ultimately deported by INS.)

---

1. The facts set forth here were derived from joint stipulations of the parties, findings announced in open court, and such evidence and testimony as was uncontested at trial.

2. The other two surviving aliens were taken to another hospital, and the cost of their care is not the subject of this litigation.

El Centro Community Hospital received warning that accident victims were on their way and began to prepare for their arrival. ECCH had established procedures for handling such disasters. Pursuant to these procedures, additional medical personnel were summoned to ECCH to assist in treating the incoming wounded. In addition, two ECCH officials, Kaye Fox and Jay Comstock, received telephone calls at home, advising them that there had been a grievous accident and that injured persons were en route to ECCH. As Assistant Director of Finance, it was Fox's responsibility to coordinate the triage and admission of the patients. Comstock, who was the hospital's administrator, had supervisory responsibility over ECCH's handling of the disaster. Comstock, Fox and a number of medical personnel arrived at ECCH ahead of the injured aliens.

Meanwhile, Supervisory Border Patrol Agent Douglas Roy ordered Agent Mario Hernandez to proceed to ECCH and, *inter alia*, gather information on the names, dates and places of birth, and medical conditions of the aliens. Agent Hernandez was dispatched to the hospital before the aliens arrived and reached the hospital ahead of them. Although he had not participated in the high-speed chase, Agent Hernandez was aware of the facts leading to the accident. Moreover, Agent Hernandez was wearing his Border Patrol uniform on which his badge was displayed.

At the hospital, Agent Hernandez identified himself as a Border Patrol Agent. He then informed Kaye Fox that the Border Patrol had been in pursuit of the van involved in the accident. Exactly what happened next is the subject of some disagreement. On this issue, the court heard testimony at trial from Kaye Fox, Jay Comstock and Agent Mario Hernandez.[3] The testimony of all three witnesses established that a further conversation took place between Fox and the uniformed Agent Hernandez just as the injured aliens were being admitted to ECCH. In that conversation, Fox identified herself as ECCH's financial officer. She then asked Agent Hernandez who was responsible for payment of the cost of the aliens' care.[4] According to Agent Hernandez, when Fox asked him who would pay, his response was "Me and you." At trial, Agent Hernandez explained that in saying this, he meant "the taxpayers" as distinct from "the Government or the Agency."

Agent Hernandez added that he told his immediate supervisor of his conversation with Kaye Fox. Specifically, Agent Hernandez testified that he informed Supervisory Border Patrol Agent Douglas Roy by telephone from the hospital that ECCH financial officer Fox had raised the concern of who would pay and he had responded, "Me and you." Despite the susceptibility of this response to varying interpretations, the government presented no evidence or testimony that there was any subsequent INS effort to clarify it.

In addition to the discussion of payment, Agent Hernandez had further interaction with hospital personnel during his visit there on the night of the accident. An ECCH nurse brought Agent Hernandez a Guatemalan passport which belonged to one of the injured aliens;[5] Agent Hernandez took possession of the passport and signed for it. Agent Hernandez obtained information on each of the alien patients as his supervisor had directed; in addition, he informed a nurse that as soon as any of the aliens was ready to be released from ECCH, such alien was to be released to the custody of the Border Patrol. A nurse then notified Agent Hernandez that one of

---

3. Fox's testimony was in the form of a videotaped deposition, as she had died of cancer prior to the date of trial.

4. The testimony conflicts as to how Agent Hernandez responded. According to Fox and Comstock, Agent Hernandez replied that the INS was responsible and would pay the bill since the injured aliens were in the custody of the Border Patrol. Resolution of the conflict is not essential to a decision in this case since, as explained in text, even accepting defendant's understanding of the objective facts, an implied-in-fact contract resulted.

5. The passport belonged to Cesar Augusto Flores de Leon, who, although initially admitted to ECCH, was air-lifted to University Hospital in San Diego that same night.

the aliens had minor injuries and was likely to be released in the morning; after conferring with his supervisor by telephone, Agent Hernandez instructed the nurse to call the Border Patrol when the alien was ready to be released, and said that the Border Patrol would come for him.

On the morning after the accident and continuing into the ensuing days, a number of other Border Patrol and INS officials came into contact with ECCH concerning the aliens. On the morning of January 23, Donald L. Davis, Officer–in–Charge of the El Centro Border Patrol station, telephoned Kaye Fox and requested that she notify the Border Patrol when any of the aliens was about to be released. On January 23 and 24, two INS investigators, Mel Gray and R.E. Novak, visited ECCH and took photographs of the aliens. Several of the aliens were unable to sign ECCH's required consent form; Investigator Novak signed the forms on behalf of these aliens on a line marked "Patient/Parent/Conservator/Guardian." In addition, an INS physician, Dr. Pavlik, visited ECCH and secured the release of the aliens' medical records. Kaye Fox's uncontested testimony was that Dr. Pavlik stated he was "responsible for medical follow-up to make sure [ECCH] doctors were taking care" of the aliens, and that he would be working with the ECCH doctors as a "consultant" or "referring physician" during the aliens' treatment.

Further, each time an alien patient became ready for release from hospitalization, ECCH personnel informed the Border Patrol, which then sent agents who took the alien into physical custody.[6] The only exception was Miguel Perez–Lopez who surreptitiously left the hospital on or about January 26. But even as to Lopez, ECCH communicated with INS. An internal Border Patrol memorandum on this subject, written by Agent Jeffrey Parsons to Officer–in–Charge Davis, stated:

> At 12:05 p.m. on January 26, 1985[,] I received a call from the Charge Nurse, Debbie Eugenio, from El Centro Commu-

nity Hospital. She stated that one of *our* injured aliens was missing and they presumed that he had *escaped.*

(emphasis added). Furthermore, Officer Davis testified that he had entered the notation "escape" next to Lopez' name on a Border Patrol list.

Finally, it should be noted that within hours of their admission to ECCH, Kaye Fox wrote two memoranda on the subject of the aliens, one to the nursing staff, the other to Jay Comstock, ECCH administrator. These memoranda were received in evidence. In them, Fox manifested her understanding that (1) the aliens were "in custody" of the INS, and (2) the INS had assumed payment responsibility for their care.

When ECCH presented invoices to INS for the aliens' medical care, INS refused payment. INS' letter denying liability gave three grounds: (1) There had been no injury-causing negligence on the part of the Border Patrol, (2) the injured aliens had not been in custody when hospitalized, and (3) Border Patrol agents' only involvement was as "good Samaritans" in calling an ambulance on behalf of the aliens. The government now contends, in its post-trial brief, that notwithstanding this court's finding of *de facto* detention, no "duly authorized [INS] official [ever] agree[d] to obligate the United States" to pay ECCH for the aliens' care.

## II. THEORIES OF RECOVERY

### A. *Statutory Basis*

Plaintiff cites 8 U.S.C. § 1252(c) and 42 U.S.C. § 249 as the statutory basis for recovery. It is well established that the United States, as sovereign, is immune from suit except to the extent that it has consented to be sued. *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). In order for a claim against the United States founded on statute to be successful, the statute relied upon must contain language which could fairly be interpreted as mandating recovery of

---

**6.** The last alien patient to be released from hospitalization was Olga Cerrito–Escobar, discharged March 18, 1985, more than seven weeks after the accident. (Plaintiff's trial exhibit 21).

compensation from the government. 28 U.S.C. § 1491(a)(1); *Duncan v. United States*, 229 Ct.Cl. 120, 138, 667 F.2d 36, 47 (1981), *cert. denied*, 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983); *Morgan v. United States*, 12 Cl.Ct. 247, 253 (1987). Accordingly, statutory language which is alleged to constitute a waiver of sovereign immunity with respect to money compensation "must be clear or strong before the court can say that the statute mandates compensation." *Mitchell v. United States*, 229 Ct.Cl. 1, 6, 664 F.2d 265, 268–69 (1981), *affirmed*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

Title 8 U.S.C. § 1252(c) (1982) provides in pertinent part: "The Attorney General is authorized and directed to arrange for appropriate places of detention for those aliens whom he shall take into custody and detain under this section." Title 42 U.S.C. § 249 (1982) provides:

(a) ... [A]t the request of the Immigration and Naturalization Service, any person detained by that Service, may be treated and cared for by the Public Health Service.

....

(c) Persons whose care and treatment is authorized by subsection (a) of this section may, in accordance with regulations, receive such care and treatment at the expense of the Service from public or private medical or hospital facilities other than those of the Service, when authorized by the officer in charge of the station at which the application is made.

■ The problem with these statutes is that neither *mandates* compensation from the United States. Section 1252(c) cannot afford relief to plaintiff for its plain language precludes its being read as a money-mandating provision. Section 249(c) *authorizes* the payment of money by the Public

Health Service to health care providers such as ECCH but only if two conditions are met: (1) Persons treated must be INS detainees, and (2) some "application" has to be made to and approved by a particular Public Health Service official. The first condition is satisfied in this case, given the finding of "de facto detention" which was announced in open court. But it is abundantly clear that plaintiff cannot satisfy the second condition. No "application" was made to a Public Health Service station nor approved by the "officer in charge of the station."

Thus, notwithstanding defendant's clear statutory authority to have arranged for the compensation of plaintiff for the medical services it rendered, and despite the fact that Congress has appropriated money for the very purpose,[7] the strict nature of the sovereign immunity doctrine dictates that ECCH cannot recover under its statutory theory. The statutes cited, which must be narrowly construed since defendant is the sovereign, simply do not appear to have been written with this kind of emergency situation in mind. To construe these statutes as mandating compensation under the facts of this case would amount to fitting a square peg into a round hole.

### B. *Contract Implied–in–Law*

If the United States could be sued on contract obligations implied-in-law, this case would be easy to resolve. Here is a textbook example of a situation in which, "for reasons of justice and equity," the law routinely "creates" an obligation of reimbursement. *Collins v. United States*, 209 Ct.Cl. 413, 424, 532 F.2d 1344, 1351 (1976); *see also Hargrove v. United States*, 1 Cl.Ct. 228, 230 (1982). Had this case involved private parties, plaintiff would have been entitled to restitution under the im-

---

7. Defense counsel acknowledged at a post-trial status conference that INS receives an appropriation to pay for necessary medical care of alien detainees (transcript of April 28, 1988 conference at 7, 13, 14, 16 and 18). *See Medical Treatment of Illegal Aliens: Hearing on H.R. 2400, H.R. 3697, H.R. 5031, H.R. 5977 and H.R. 6440 Before the Subcomm. on Health and the Environment of the House Comm. on Interstate and Foreign Commerce*, 95th Cong., 1st Sess. 32 (1977) (statement of Hon. Leonel Castillo, Commissioner, INS); *see also* Supplement to Commissioner Castillo's subcommittee testimony (a legal memorandum prepared by INS' Office of General Counsel) at 2: "Each year, the [INS] requests and receives an appropriation from Congress for the express purpose of providing medical care to alien detainees" (Appendix to Plaintiff's Post-trial Brief).

plied-in-law, or "quasi-contractual," doctrine of emergency assistance. That doctrine holds:

A person who has performed the duty of another by supplying things or services although acting without the other's knowledge or consent, is entitled to restitution from the other if

(a) he acted unofficiously and with intent to charge therefor, and

(b) the things or services supplied were immediately necessary to satisfy the requirements of public decency, health or safety.

Restatement of Restitution § 115; *Peninsular & Oriental Steam Navigation Co. v. Overseas Oil Carriers, Inc.,* 553 F.2d 830, 834 (2d Cir.), *cert. denied,* 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977); *United States v. Consolidated Edison of New York,* 580 F.2d 1122, 1127 (2d Cir.1978).

■ In the case at bar, given (1) the emergency situation, (2) ECCH's clearly manifested intention to be compensated for its services, (3) this court's finding of *de facto* INS detention and (4) the conceded duty of INS to furnish necessary medical care to its detainees,[8] plaintiff has established all the requisites for recovery under the emergency assistance doctrine. However, because the defendant is the government, special rules apply. The government can be sued, in this or any court, only to the extent that it has relinquished its sovereign immunity. *United States v. Testan,* 424 U.S. at 399, 96 S.Ct. at 953; *United States v. Sherwood,* 312 U.S. 584, 587–88, 61 S.Ct. 767, 770–71, 85 L.Ed. 1058 (1941); *Tucker v. United States,* 7 Cl.Ct. 374, 376 (1985). Congress has undertaken no such relinquishment with respect to contract obligations implied-in-law. *Aetna Casualty & Surety Co. v. United States,* 228 Ct.Cl. 146, 164, 655 F.2d 1047, 1059–60 (1981); *People's Bank & Trust Co. v. United States,* 11 Cl.Ct. 554, 566 (1987).

### C. *Contract Implied–in–Fact*

The government may be liable on contract obligations implied-in-fact, however, and this court has jurisdiction over such actions. 28 U.S.C. § 1491(a)(1); *Nitol v. United States,* 7 Cl.Ct. 405, 415 (1985); *Brannan v. United States,* 7 Cl.Ct. 399, 404 (1985). But defendant contends that the only contract plaintiff can establish here is one implied-in-law, on which the sovereign is immune to suit. This case does present an implied-in-law contract situation; however, the presence of an implied-in-law contract does not necessarily preclude the availability of alternative contractual bases of recovery. For example, in *United States v. Consolidated Edison Co. of New York,* 452 F.Supp. 638 (S.D.N.Y.1977), *affirmed in pertinent part,* 580 F.2d 1122 (2d Cir.1978), the court awarded implied-in-law contractual recovery under the doctrine of emergency assistance while noting that the plaintiff would also have been entitled to recover for breach of an express oral contract were it not for a Statute of Frauds problem. 452 F.Supp. at 653.

Whether recovery under an implied-in-fact contract is available to plaintiff in the instant case depends on whether plaintiff has shown all the elements required to establish an express contract. *Yachts America, Inc. v. United States,* 779 F.2d 656, 661 (Fed.Cir.1985), *cert. denied,* 479 U.S. 832, 107 S.Ct. 122, 93 L.Ed.2d 68 (1986). There must be mutuality of intent, consideration, and a lack of ambiguity in offer and acceptance. *Id.; Squirrel Creek Associates v. United States,* 11 Cl.Ct. 212, 216 (1986); *Nitol v. United States,* 7 Cl.Ct. at 415. These contractual elements may be inferred from the conduct of the parties which shows, in light of the surrounding circumstances, their tacit understanding.

---

**8.** Parties' "Joint Memorandum Re: Stipulations," filed October 9, 1987, ¶ 2 ("Defendant ... through the ... INS ... is responsible for the care of individuals taken into custody or detained by the United States Border Patrol as suspected illegal aliens"); Transcript of April 28, 1988 Status Conference at 7; *see also* Legal Memorandum of INS General Counsel, *supra* note 7 at 2 (and cases therein cited); *Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983) ("the Due Process Clause requires the responsible government agency to provide medical care to suspects in police custody who have been injured while being apprehended by the police").

*Algonac Mfg. Co. v. United States,* 192 Ct.Cl. 649, 673–74, 428 F.2d 1241, 1255 (1970); *DeRoo v. United States,* 12 Cl.Ct. 356, 361 (1987); *Hargrove v. United States,* 1 Cl.Ct. at 230.

In determining whether mutuality of intent has been established, it is important to remember that "for a contract to exist there does not have to be, and rarely is, a *subjective* 'meeting of the minds' all along the line." *Penn–Ohio Steel Corp. v. United States,* 173 Ct.Cl. 1064, 1084 n. 19, 354 F.2d 254, 266 n. 19 (1965), *quoting WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 11, 323 F.2d 874, 879 (1963) (emphasis added). Rather, the inquiry is an objective one. Acceptance of the offer must be manifested by conduct which, viewed objectively, indicates assent to the proposed bargain. *See Russell Corp. v. United States,* 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977). It is neither necessary nor practical to enter the minds of the parties. As the Court of Claims observed,

> A manifestation of mutual assent by the parties to a contract is essential to its formation and the acts by which such assent is manifested must be done with the intent to do those acts; but, generally, neither mental assent to the promises in the contract nor real or apparent intent that the promises shall be legally binding is essential.

*Goltra v. United States,* 119 Ct.Cl. 217, 251–52, 96 F.Supp. 618, 623 (1951).

Thus, in analyzing Agent Hernandez' statement to Fox as well as the conduct of other INS and ECCH personnel which was established at trial, the inquiry is not what the various actors intended their conduct to convey; instead, the question is whether the parties' conduct, viewed objectively, manifested and confirmed a tacit understanding that the INS had assumed payment responsibility for the aliens' care.

As noted above, there was a conflict in the testimony regarding precisely how Agent Hernandez responded to Kaye Fox's question about payment. Nevertheless, the meaning which Kaye Fox and Jay Comstock attached to Agent Hernandez' response was not a subject of dispute. In a memorandum written within hours of her conversation with Agent Hernandez, Kaye Fox stated her understanding that the INS, through Agent Hernandez, had assumed payment responsibility.[9] It is a well-established principle of contract law that

> the manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if ... that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party.

Restatement 2d of Contracts § 20(2)(b); *Perez v. State of Maine,* 760 F.2d 11, 13 (1st Cir.1985).

Assuming that Agent Hernandez' version of the conversation was accurate, it is not surprising that Fox would have understood it as she did.[10] Indeed, defendant's counsel conceded in closing argument that "confusion ... may have been generated by Hernandez' cryptic remark" (transcript, p. 228) and added:

> Mr. Comstock and Ms. Fox may well have thought they heard Mr. Hernandez say more than he did, more than his cryptic remark that when asked who's going to pay for it he responded "me and you" or "you and me." That remark could well be interpreted in the context as saying the Taxpayer and [as] implying that the United States would be responsible for payment, and it would not surprise me in the chaotic situation of an emergency room where a remark is made like that that it could be recalled later as

---

9. The issue of Agent Hernandez' authority to bind the Government is addressed in Section 1 below.

10. In response to Kaye Fox's inquiry concerning payment, Agent Hernandez (or his supervisor Douglas Roy upon being informed of the exchange) could have said that he did not know who would pay or he could have asserted that the INS had no responsibility for payment. Instead, he gave an answer that reasonably understood in the circumstances of its utterance to mean that the United States Government was going to pay.

being an assertion that the Border Patrol and the Immigration Service of the United States [were] responsible for the medical care.

(Transcript at 227). Defendant, in short, did have "reason to know the meaning attached" to Hernandez' remark by ECCH. Restatement 2d of Contracts, § 20(2)(b).

But can it be concluded that Kaye Fox had "no reason to know of any different meaning attached" by Agent Hernandez to the "me and you" response? In light of the circumstances, it would be difficult to find otherwise. Agent Hernandez had just recounted to Fox the events which culminated in the van accident. He was wearing his Border Patrol uniform with badge displayed. If, indeed, he answered "me and you" to the payment question, the objectively reasonable interpretation would be "me and you" as Federal taxpayers, i.e., the United States Government.

While it could be asserted that Fox might reasonably have interpreted Hernandez' reply to mean "me and you" as *state* taxpayers, or "me and you" as consumers of local medical services, such contentions lack appreciation of the surrounding circumstances. There was no proof that Fox and Agent Hernandez were previously acquainted. As a Border Patrol Agent, Hernandez would not necessarily share California taxpayer status with Fox; viewed from her perspective, he could as well have been a taxpayer from a distant state whom the Border Patrol had temporarily assigned to duty in California. Nor, for like reasons, would Hernandez necessarily share local consumer status with Fox. Simply put, "me and you," when uttered in this context, connoted commonality of status and interest; the only interest and status *evidently* shared by Hernandez and Fox was that of Federal taxpayer. Accordingly, since the INS had reason to know the meaning attached to Hernandez' "cryptic remark" by ECCH, and ECCH had no reason to know Hernandez' different meaning, ECCH's understanding should prevail.

But ECCH's implied-in-fact contract claim does not stand or fall solely on the legal significance of the Hernandez/Fox discussion. This case presents an abundance of other conduct by the parties which tends to confirm the requisite "tacit understanding." Perhaps most significant is the cooperation between ECCH and INS. ECCH's actions of (1) notifying INS prior to the release of each alien, (2) sharing information with INS on the aliens' vital statistics, medical condition and progress, (3) surrendering aliens' property to INS and (4) notifying INS when one alien surreptitiously departed were all acts of cooperation *requested* and accepted by INS. Further, Investigator Novak's signing of consent forms as the alien patients' "parent, conservator or guardian" unambiguously suggested that INS' relationship to the aliens was that of responsible party. And Dr. Pavlik's conduct in obtaining medical records and monitoring progress and treatment again demonstrated INS responsibility for the aliens. Indeed, throughout late January and all of February 1985 (a period during which the hospital stay of all but one alien patient was completed), various representatives of the government came and went, and at no time did any of them say or do anything inconsistent with the understanding that INS stood as responsible party for the patients. Instead, an objective examination of the parties' behavior cannot fail to yield the unmistakable conviction that these parties had an unspoken understanding. The understanding was that INS, as the party responsible for the aliens, possessed all the benefits and burdens that such responsibility entails including, necessarily, liability for cost of treatment.[11]

■ To summarize, objective analysis of the parties' conduct reveals that defendant (1) knew of plaintiff's concern about payment, (2) knew plaintiff could reasonably have taken Agent Hernandez' answer as an assumption of payment responsibility, (3) did nothing to dispel that notion, and (4) engaged instead in conduct which gave every indication that INS was the party responsible for the aliens. These circumstances illustrate that, between these par-

---

**11.** The amount of this cost has been stipulated by the parties at $183,263.64.

ties, the equivalent of mutual assent was present. *Collins v. United States*, 209 Ct.Cl. at 424, 532 F.2d at 1351. Put another way, the parties' conduct indicates that plaintiff and defendant, in fact, took upon themselves corresponding obligations and liabilities and, viewed objectively, came to that meeting of the minds sufficient to establish an implied-in-fact contract. *Hirschmann v. United States*, 11 Cl.Ct. 338, 341–42 (1986).

### 1. *Authority to Bind the Government*

Defendant argues that even if the conduct of government officials in this case were otherwise sufficient to establish an implied-in-fact contract, none of those officials had authority to obligate the government. Unquestionably, just as with an express contract, officials whose conduct is relied upon to establish an implied-in-fact contract must have actual authority to bind the government. *City of Alexandria v. United States*, 737 F.2d 1022, 1027 (Fed. Cir.1984); *ATL, Inc. v. United States*, 4 Cl.Ct. 672, 675, *affirmed in pertinent part*, 736 F.2d 677 (Fed.Cir.1984). Further, "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

The question whether a government actor has authority is frequently purely legal in nature, e.g., where a particular statute or regulation specifically enumerates the powers of particular officials. In other instances, the issue is a factual one. For example, where a statute permits delegation to lower-ranking officials, there may be a factual question whether the requisite delegation took place. If a factual showing is necessary, the affirmative burden of showing such facts rests with the plaintiff. *See Ysasi v. Rivkind*, 856 F.2d 1520, 1525

(Fed.Cir.1988); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed. Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985); *Jascourt v. United States*, 207 Ct.Cl. 955, 955–56, 521 F.2d 1406, *cert. denied*, 423 U.S. 1032, 96 S.Ct. 562, 46 L.Ed.2d 405 (1975); *Housing Corp. of America v. United States*, 199 Ct.Cl. 705, 711, 468 F.2d 922, 925 (1972).

In this case, as defendant correctly observes, there was no testimony concerning the authority of Agent Hernandez to obligate defendant to pay for medical care. Accordingly, if plaintiff could prevail only through a factual showing of Hernandez' actual authority, its failure to carry this burden would compel a finding of no binding contract.

But where authority is in issue, analysis should begin with the law. This court knows of no statute, regulation or case which would preclude Agent Hernandez' exercise of government authority to obligate funds for emergency medical treatment of detainees injured during the course of apprehension.[12] Instead, there exists at least one case that indicates government actors may have enhanced authority to obligate funds during emergencies.

This case arises from an emergency situation. Agent Hernandez was the first Border Patrol officer at the hospital. Government officials who might not otherwise have authority to make arrangements and incur obligations on behalf of the government may be able to exercise such authority during an emergency so that immediate remedial action can be taken. *See Halvorson v. United States*, 126 F.Supp. 898 (E.D. Wash.1954). The *Halvorson* case illustrates the propriety of permitting an otherwise unauthorized person to obligate the government in an emergency. In *Halvorson*, a three-day Montana blizzard had caused the accumulation of some four feet of snow in the attics of buildings under construction for the U.S. Army Corps of

---

**12.** *See People's Bank & Trust Co. v. United States*, 11 Cl.Ct. 554, 565 (1987) ("Requiring citizens dealing with the Government to determine the absence of authority from a confusing, technical and hard-to-find regulation, following a representation from the Government to the con- trary, is bad enough when the prohibitory regulation has been printed. Expecting a [citizen] in this situation to determine lack of authority when no regulation even exists is well-nigh intolerable").

Engineers. 126 F.Supp. at 900. If the snow, which had blown in through ventilation slots, had not been removed immediately, great damage would have resulted to plastered ceilings and walls below. *Id.* The district court held that Corps of Engineers officials on the scene had "authority to direct the contractors to proceed at once to minimize the damage by immediate remedial action," and awarded contractual recovery to plaintiff for the cost of the snow removal. 126 F.Supp. at 901.

Thus, it is concluded that the question of authority in this case simply does not admit of an easy answer. However, even assuming that Agent Hernandez lacked authority to bind the government, his conduct was nevertheless ratified by INS.

### 2. *Ratification*

Ratification, to be effective, requires knowledge of the facts. *United States v. Beebe,* 180 U.S. 343, 354, 21 S.Ct. 371, 375, 45 L.Ed. 563 (1901); *Williams v. United States,* 130 Ct.Cl. 435, 447, 127 F.Supp. 617, 623 *cert. denied,* 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266 (1955); *Timberland Paving & Construction Co. v. United States,* 8 Cl.Ct. 653, 661 n. 22 (1985). Knowledge "must be shown or such facts proved that its existence is a necessary inference from them." *United States v. Beebe,* 180 U.S. at 354, 21 S.Ct. at 375. Here, there can be no dispute that INS had knowledge of all the conduct pertinent to this court's finding of an implied-in-fact contract. Indeed, even in the face of the knowledge defendant possessed, especially its knowledge of Agent Hernandez' payment discussion with Kaye Fox and his alleged "cryptic reply," INS took no action to assert its non-liability for the aliens' care until its letter dated March 7, 1985. By that time, all but one of the aliens had already been discharged from the hospital and taken into custody by INS. *See* Plaintiff's Exhibits 21 and 41 and note 6, *supra.* Instead, as detailed

above, there were numerous instances of confirming conduct. Such behavior can spell only acquiescence and ratification by silence and inaction [13] as well as by conduct. *See Williams v. United States,* 130 Ct.Cl. at 447, 127 F.Supp. at 623; *Centre Mfg. Co. v. United States,* 183 Ct.Cl. 115, 128, 392 F.2d 229, 236 (1968).

### III.  THE SLIPPERY SLOPE

During oral argument, defendant's counsel expressed concern that a decision for plaintiff might "turn the Immigration and Naturalization Service and Border Patrol into a general health insurer for people illegally in the United States" (transcript at 221). The discussion set forth above should lay to rest the government's anxiety regarding the sweep of this decision. The presence in this case of peculiar facts renders defendant's floodgate argument unpersuasive.

### IV.  CONCLUSION

Based on the findings of fact, conclusions of law and related reasoning announced in open court and set forth in this opinion and, further, based on the parties' stipulation of quantum, it is ORDERED that judgment be entered in favor of plaintiff in the principal sum of $183,263.64, together with interest thereon from May 13, 1985 as provided by 41 U.S.C. § 611.

---

**13.** Indeed, INS had ample opportunity to deny its liability while most of the aliens were still hospitalized. Kaye Fox undertook to confirm INS' obligation of payment over the course of several weeks in early February 1985, but she "couldn't get anyone to call [her] back" (trial tr. at 47). Finally, late in February, Fox and a Dr. Kurland of ECCH spoke with INS' James O'Keefe in Los Angeles (trial tr. at 48). O'Keefe was the official in charge of all management functions at INS' Western Regional Office (trial tr. at 116). Instead of denying INS liability, O'Keefe merely promised to "check into" the matter (trial tr. at 48).