CITY OF EL CENTRO, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 208–86–C.

United States Claims Court.

Aug. 7, 1989.

J. Mark Waxman, Los Angeles, Cal., argued, for plaintiff. With him on the opposition to defendant's motion for reconsideration or rehearing was James R. Kalyvas, Los Angeles, Cal.

Stephen J. McHale, Washington, D.C., argued, for defendant. With him on the motion for reconsideration or rehearing were Acting Asst. Atty. Gen., Stuart E. Schiffer and David M. Cohen, Washington, D.C.

## OPINION ON RECONSIDERATION

TURNER, Judge.

In an opinion filed March 16, 1989, this court determined that plaintiff had established an implied-in-fact contract with the Immigration and Naturalization Service entitling it to compensation for medical care rendered to 14 illegal aliens. *City of El Centro v. United States*, 16 Cl.Ct. 500 (1989). On March 30, 1989, defendant filed a motion for reconsideration or rehearing. This opinion addresses defendant's motion.

The parties have briefed and argued the issues raised by defendant. For reasons set forth below, we conclude that defendant's motion should be denied. Because the matters raised in defendant's motion merit discussion and analysis, this opinion supplements the court's March 16, 1989 opinion, with which familiarity is presumed.

## I

In its motion for reconsideration or rehearing, the government urges that the court improperly awarded recovery under an implied-in-fact contract because plaintiff had abandoned its implied-in-fact contract claim prior to trial. Further, defendant asserts that plaintiff's case lacked an essential element of an implied-in-fact contract because of its failure to establish either (1) that the government actors on whose conduct the contract was based possessed authority to bind the government, or (2) that the conduct in question was nevertheless ratified by the government. Finally, defendant argues that plaintiff's implied-in-fact contract claim must be dismissed for failure to meet the jurisdictional prerequisites of the Contract Disputes Act, 41 U.S.C. §§ 601–613. Defendant seeks dismissal of the complaint, or, in the alternative, re-opening of the proceedings on the issues of authority and ratification.

## II

### A. *Abandonment of Implied–in–Fact Contract Claim*

■ Defendant's contention that plaintiff abandoned its implied-in-fact contract claim (which was explicitly set forth in the complaint) rests on assertions that (1) no mention of the implied-in-fact contract claim can be found in the parties' "Joint Statement of Issues of Facts and Law to be Resolved by the Court" filed before trial and (2) trial proceeded solely on plaintiff's statutory theory. We conclude that an implied-in-fact contract theory was not abandoned by plaintiff.

While it is true that the parties' joint statement of issues filed pursuant to

RUSCC, Appendix G, ¶ 15[1] does not contain an explicit statement of an implied-in-fact contract issue, several of the issues set forth in the parties' joint statement could pertain to a contract theory.

For example, the very first issue of fact listed by the parties was

> Whether any representative of the Immigration and Naturalization Service (INS) advised any representative of El Centro Community Hospital (ECCH) that ECCH would be reimbursed for medical care furnished to individuals injured in [the] automobile accident [that] follow[ed] the high speed chase by Border Patrol Agents ... on or about January 23, 1985.

Joint Statement of Issues of Facts and Law to be Resolved by the Court at 1, ¶ 1. Similarly, listed as an issue of law was

> Whether the INS is responsible for reimbursement of medical expenses for ECCH's treatment of the injured fourteen individuals when the INS had reasonable suspicion that these individuals were illegal aliens, requested ECCH to contact the INS when the individuals were to be released and Border Patrol agents came to the hospital to take them into physical custody upon their discharge.

Joint Statement at 3, ¶ 4. These questions focus upon the significance of government actors' conduct in light of surrounding circumstances—the core concern of any implied-in-fact contract claim. *E.g., Algonac Mf'g Co. v. United States*, 192 Ct.Cl. 649, 673–74, 428 F.2d 1241, 1255 (1970); *DeRoo v. United States*, 12 Cl.Ct. 356, 361 (1987). It is concluded that it would be unfair to find an "abandonment" of plaintiff's contractual theory based on the parties' pretrial statement of issues.

Nor could it be said that trial proceeded solely on plaintiff's statutory theory. During his opening statement at trial, defense counsel invited the court to find that plaintiff had abandoned its contract theory, but the court declined this invitation. Before the first witness was sworn, the following exchange occurred between defense counsel and the court:

> [Government counsel]: Your Honor, just so I can clarify that, are you suggesting then that there might be some other theory rather than [42 U.S.C. § ] 249 that might be involved in this case; is that what you're looking for?
>
> The Court: Well, I'm just sharing with you that I'm wondering if that isn't the case.
>
> [Government counsel]: Yes, sir.
>
> The Court: And it may be ... [that] we all agree that [42 U.S.C. § ] 249 just really isn't addressing the facts that occurred, whatever they turn out to be.
>
> [Government counsel]: Thank you, your Honor.

Trial Transcript at 20–21. During his closing argument, government counsel stated:

> In all honesty, your Honor, I thought that [the implied-in-fact contract] claim had been abandoned. I don't believe it's raised as an issue in the pre-trial statement but, *to the extent that it is an issue in the case*, and maybe I missed it but I don't remember it being an issue, but *to the extent that it is an issue in the case*, [there was no proof by plaintiff of authority to bind the government].

Tr. at 236. (Emphasis added.) Finally, upon the court's request for post-trial briefs on theories of recovery (transcript of April 28, 1988 status conference, pp. 20–21), the parties' briefs addressed both statutory and implied-in-fact contract theories.

In summary, because the implied-in-fact contract theory (1) was expressly raised in the complaint, (2) was never formally dismissed from the case, (3) remained applicable to the parties' statement of issues, (4) retained vitality (as recorded in the tran-

---

**1.** RUSCC, Appendix G, ¶ 15 provides in pertinent part:

Issues of Fact and Law.... [T]he parties shall also file a joint statement setting forth the issues of fact and the issues of law to be resolved by the court. Issues should be set forth in sufficient detail to enable the court to resolve the case in its entirety by addressing each of the issues listed. The statement of issues shall control the admissibility of evidence at trial and evidence will be deemed to be irrelevant unless it pertains to one or more of the issues.

script) at the start of trial, (5) was supported by evidence presented at trial and (6) was one of the theories on which the court received post-trial briefing, the government's claim of abandonment is rejected.

B. *Authority to Bind the Government*

■ In the March 16 opinion, we stopped short of holding that Agent Hernandez possessed authority to obligate the government, finding instead that the issue "simply [did] not admit of an easy answer." *City of El Centro*, 16 Cl.Ct. at 509. However, citing *Halvorson v. United States*, 126 F.Supp. 898 (E.D.Wash.1954), we noted that

> Government officials who might not otherwise have authority to make arrangements and incur obligations on behalf of the government may be able to exercise such authority during an emergency so that immediate remedial action can be taken.

*City of El Centro*, 16 Cl.Ct. at 508.

In its opposition to the instant motion, plaintiff has cited a case which reinforces this principle: *Philadelphia Suburban Corp. v. United States*, 217 Ct.Cl. 705 (1978). In *Philadelphia Suburban*, a collision of two tankers on the Delaware River resulted in an oil fire. The U.S. Coast Guard, acting through an officer and two enlisted men, first assisted and later directed local firefighters in fighting the blaze. In the course of battling the flames, the firefighters used a substantial amount of plaintiff's firefighting foam. When plaintiff subsequently requested payment for the foam, the government refused, assert-

ing that "none of the Coast Guard personnel at the fire had any [government] authority to contract, either expressly or impliedly, for any use of the foam." *Philadelphia Suburban*, 217 Ct.Cl. at 706–7. The Court of Claims remanded for trial, declaring:

> [I]t may turn out, when the facts and circumstances are fully canvassed, that it was inherent or implied in the authority of the federal personnel acting in such emergency firefighting situations to procure and use on the spot the necessary or appropriate fire-fighting supplies.

*Philadelphia Suburban*, 217 Ct.Cl. at 707.[2]

The Court of Claims' reasoning in *Philadelphia Suburban* provides support for holding that the emergency situation cloaked Agent Hernandez with authority to obligate appropriated funds for the emergency medical treatment of the INS detainees in this case. Given the emergency situation, the finding of *de facto* detention, the existence of Congressionally-appropriated funds for INS detainees' emergency medical care, and the strength of the *Philadelphia Suburban* holding, it is concluded that such authority was inherent in, and a necessary and integral part of, Agent Hernandez' authorized duties.[3]

C. *Ratification*

■ In the March 16 opinion, we held that even if Agent Hernandez lacked authority to bind the government, his actions were nevertheless ratified by INS. *City of El Centro*, 16 Cl.Ct. at 509. The government asserts that ratification can be effective only if such ratification is by an official possessing authority to contract on behalf of the United States. Further, defendant

---

**2.** On remand, the trial judge concluded that although Coast Guard firefighters on the scene had authority to *use* the foam, they did not have authority to *contract for the purchase* of the foam. *Philadelphia Suburban Corp. v. United States*, No. 446–75, slip opinion at 16 (Ct.Cl. March 6, 1981). Nevertheless, the trial judge found that the government's actions constituted a Fifth Amendment taking which entitled plaintiff to compensation. Slip opinion at 11–12. In accordance with the subsequent stipulation of the parties, the Court of Claims entered judgment for plaintiff. *Philadelphia Suburban Corp. v. United States*, 229 Ct.Cl. 600 (1981).

**3.** During oral argument, government counsel urged that the language of *Philadelphia Subur-*

*ban Corp. v. United States*, 217 Ct.Cl. 705 (1978) indicates that more facts are needed before authority could be found in this case. While it is true that the *Philadelphia Suburban* court remanded so that "the facts and circumstances [could be] fully canvassed," *Philadelphia Suburban Corp.*, 217 Ct.Cl. at 707, trial had not yet been held at the time the trial court had issued its ruling. In the instant case, by contrast, trial has already been held and the facts and circumstances pertinent to the emergency situation as well as to any inference of Agent Hernandez' inherent authority to deal with it *have* been "fully canvassed." *Id.*

urges that "a particular individual must be identified as the ratifying official and some exploration must be made of his knowledge." Def. Motion for Reconsideration or Rehearing at 7. The sole case which defendant cites on this point does not require such a rule here.[4] Instead, there exists binding authority in this Circuit that permits a finding of *institutional* ratification. *Silverman v. United States*, 230 Ct.Cl. 701, 710, 679 F.2d 865, 870 (1982). Institutional ratification occurred in this case.

In *Silverman*, a senior Federal Trade Commission (FTC) official, whom the court recognized as lacking authority to obligate the government in contract, advised a court reporting company that if it delivered certain transcripts to FTC, then FTC would pay the company for the transcripts. The transcripts were delivered, but FTC refused to pay for them. The Court of Claims held that FTC was liable for the cost of the transcripts based on an implied-in-fact contract. The lack-of-authority problem was cured by ratification: "By accepting the benefits flowing from the senior FTC official's promise of payment, *the FTC ratified* such promise and was bound by it." *Silverman*, 230 Ct.Cl. at 710, 679 F.2d at 870 (emphasis added).

█ It would be difficult to read the Court of Claims' phrasing ("the FTC ratified") as anything other than a finding that the FTC *as an institution* ratified the contract; this court is persuaded, therefore, that it is legally possible for a government agency to ratify an otherwise technically unauthorized commitment and that a particular ratifying official possessing contractual authority need not necessarily be identified in order to show ratification.

Apart from its holding that institutional ratification is possible in the government contracts area, *Silverman* also stands for the principle that *acceptance of benefits* can constitute ratification and thus render enforceable an otherwise defective government contract. Many cases echo this principle, *e.g.*, *United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed.Cir.1986); *Philadelphia Suburban*, 217 Ct.Cl. at 707; *Prestex, Inc. v. United States*, 162 Ct.Cl. 620, 628–30, 320 F.2d 367, 373–74 (1963); *New York Mail & Newspaper Transp. Co. v. United States*, 139 Ct.Cl. 751, 154 F.Supp. 271, *cert. denied*, 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957). In this case, there can be no dispute that INS and the Border Patrol accepted the benefits flowing from their agents' legally-significant conduct. Accordingly, "ratification by acceptance of benefits" is added to the ratification by silence, inaction, and confirming conduct that this court found in its original opinion. *City of El Centro*, 16 Cl.Ct. at 509.[5]

### D. *Contract Disputes Act*

Defendant contends that this court's March 16, 1989 opinion and order was void

---

**4.** *Consortium Venture Corp. v. United States*, 5 Cl.Ct. 47, 51 (1984), *aff'd*, 765 F.2d 163 (Fed.Cir. 1985) hinged its discussion of ratification wholly upon 41 C.F.R. § 1–1.405 (1984) ("Ratification of unauthorized contract awards"), a provision which was superseded when the Federal Acquisition Regulations (FAR) went into effect on April 1, 1984 and which thereafter applied only to contracts formed prior to April 1, 1984. *See* 50 *Federal Register* 26987–88 (July 1, 1985). The original FAR did not contain any similar provision; indeed, no like provision appeared in the FAR until February 1988 when 48 C.F.R. § 1.602–3 ("Ratification of unauthorized commitments") became effective. Hence, even assuming the FAR applied to this contract, defendant's proposed ratification rule would still not govern, since FAR contained no provision respecting ratification that was effective at the time this contract was formed.

**5.** During oral argument, defense counsel protested that the ratification-through-acceptance-of-benefits cases are actually implied-in-law contract cases which introduce inconsistency into the otherwise strong principle that the United States cannot be sued on obligations implied-in-law. We find no inconsistency. Those cases (and this one) consider the government's acceptance of benefits *only* for purposes of determining whether the *authority element* of the implied-in-fact contract has been satisfied through ratification. All the other elements of an express contract must also be established before recovery can be had. This renders such cases readily distinguishable from implied-in-law contracts, where recovery derives *solely* from the conferral of a benefit, and the usual contractual element of mutual assent need not be shown. *Aetna Casualty & Surety Co. v. United States*, 228 Ct.Cl. 146, 164, 655 F.2d 1047, 1059–60 (1981); *Collins v. United States*, 209 Ct.Cl. 413, 424, 532 F.2d 1344, 1351 (1976); Restatement of Contracts 2d § 4 Comment b; *see also* Restatement of Restitution §§ 112–117.

for lack of jurisdiction insofar as it addressed plaintiff's implied-in-fact contract claim, since plaintiff never fulfilled the jurisdictional prerequisites of the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613. Plaintiff counters that the CDA does not apply to its contract claim but that even if it does apply, its requirements have been met.

### 1. *Applicability of the CDA*

■ By its terms, the CDA applies to "any ... implied contract ... entered into by an executive agency for ... the procurement of services." 41 U.S.C. § 602(a)(2). This clear statutory language covers the instant contract. The authorities cited by plaintiff for a contrary conclusion are distinguishable.[6] Accordingly, unless plaintiff has satisfied the jurisdictional prerequisites of (1) submitting each claim to the contracting officer in writing, (2) certifying any claim over $50,000, and (3) awaiting a decision or deemed decision thereon, this court would lack jurisdiction over plaintiff's implied-in-fact contract claims. 41 U.S.C. § 605; *W.M. Schlosser Co. v. United States*, 705 F.2d 1336, 1339 (Fed.Cir.1983); *Paragon Energy Corp. v. United States*, 227 Ct.Cl. 176, 184, 645 F.2d 966, 971 (1981); *Acousti Engineering Co. v. United States*, 15 Cl.Ct. 698, 700 (1988). *See also Claude E. Atkins Enters., Inc. v. United States*, 15 Cl.Ct. 644, 646 (1988); *Rider v. United States*, 7 Cl.Ct. 770, 775 (1985), *aff'd*, 790 F.2d 91 (Fed. Cir.1986) and cases therein cited.

### 2. *Submission of a "Claim" to "the Contracting Officer"*

■ Defendant's contention that plaintiff never submitted a claim to the contracting officer rests on assertions that (1) plaintiff submitted mere invoices, and mere invoices are not CDA "claims," (2) defendant's letters denying liability contain no

reference to any alleged contract, and (3) nothing in the record suggests plaintiff submitted anything to, or even contacted, any government contracting official.

The CDA provides: "All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for decision." 41 U.S.C. § 605(a). As this court has noted, "[n]either the CDA nor its legislative history contains a specific definition of the term 'claims.'" *Z.A.N. Co. v. United States*, 6 Cl.Ct. 298, 304 (1984). However, in construing that term, the Federal Circuit has stated:

> We know of no requirement in the [CDA] that a 'claim' must be submitted in any particular form or use any particular wording. All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.

*Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir. 1987).

Defendant furnishes no binding authority for its assertion that invoices can never be CDA "claims." The cases defendant cites for this proposition are based not on a CDA definition of "claims" but on definitions found (1) in the disputes clauses of particular contracts or (2) in non-binding regulations. *Gardner Machinery Corp. v. United States*, 14 Cl.Ct. 286, 291–92 (1988); *Esprit Corp. v. United States*, 6 Cl.Ct. 546, 548 (1984), *aff'd*, 776 F.2d 1062 (Fed.Cir. 1985); *Z.A.N. Co.*, 6 Cl.Ct. at 304 n. 11. Moreover, the Federal Circuit recently declined a government invitation to find that invoices are not "claims" under the Act. *Contract Cleaning Maintenance, Inc.*, 811 F.2d at 593.

---

6. In each case cited, the court expressly found that the contract at issue was not for the procurement of goods or services. In *Busby School of Northern Cheyenne Tribe v. United States*, 8 Cl.Ct. 596, 600 (1985), the contracts were "grant or sociological type contracts designed to accomplish government social policy goals." In *Newport News Shipbuilding & Dry Dock Co. v. United States*, 7 Cl.Ct. 549 (1985) and *Delta S.S.*

*Lines, Inc. v. United States*, 3 Cl.Ct. 559 (1983), the contracts were for government subsidy of shipbuilding, pursuant to statute, in exchange for possible governmental use of the ships in time of war or national emergency. And the contract at issue in *Coastal Corp. v. United States*, 713 F.2d 728, 730 (Fed.Cir.1983) was an implied contract to consider bids fairly and honestly.

In any event, it is evident that plaintiff submitted more than "mere invoices" in this case. Although the record is devoid of plaintiff's claim letters, it is clear from the reply letters—which are deemed to be decisions of the INS—that plaintiff had made claims for final payment for the medical services it rendered to patients who had been injured in the course of apprehension by the Border Patrol. The reply letters, which were all identical save the name of the patient involved, stated as follows:

This letter is to advise you that the United States Border Patrol and/or the Immigration and Naturalization Service is not responsible for any medical expenses incurred by *[name of patient]*. To the best of my information the Border Patrol's only involvement was as a 'good [S]amaritan' in calling an ambulance on behalf of *[name of patient]* to the scene of the accident. Pursuant to 28 U.S.C. [§] 1274, the United States Government is liable for tort claims in the same manner and to the same extent as private individuals. For the United States to be liable, in tort, there would have to be negligence on the part of their agents. In the present case, the United States did not cause the injury by any negligent act or omission and therefore would not be liable under the Federal Tort Claims Act, 28 U.S.C. [§] 2674.

The Immigration and Naturalization Service is not responsible for the medical care of aliens within the United States. The *only* exception to this rule is an alien in custody, where Congress has provided authority to provide such medical care. 42 U.S.C. [§] 249(c). The Congress of the United States appropriates funds to governmental agencies. These appropriations specify the usages to which these funds may be put. The Immigration and Naturalization Service, therefore, may not lawfully expend funds from its appropriation to reimburse state, local or private hospitals for funds expended by

them in circumstances where the Immigration and Naturalization Service is not responsible.

I must, therefore, refuse to entertain your *claims.* If you have any information to suggest a basis for liability pursuant to the principles discussed herein, that information should be communicated to this office and it will be reviewed.

Plaintiff's Trial Exhibits 22 and 41–50 (emphasis added). Each reply letter was signed by the Regional Commissioner of the INS.

Defendant urges that because the reply letters discuss only liability based on tort or statute and lack any mention of a contractual basis of recovery,[7] plaintiff must not have provided "adequate notice of the *basis . . .* of [its] claim." *Contract Cleaning Maintenance, Inc.,* 811 F.2d at 592 (emphasis added). This contention is rejected. Each reply letter was clearly intended as a comprehensive denial of governmental liability for the services rendered—a suitable response to an unrestricted demand for payment. Use of the phrase "the *only* exception" suggests that INS had considered all legal bases of liability and rejected them all. It appears that INS "was not at all confused as to the nature of what was being requested." *Paragon Energy Corp.,* 227 Ct.Cl. at 192, 645 F.2d at 976. Certainly there was no confusion in identifying the episode from which plaintiff's request originated. Under these circumstances, it is concluded that plaintiff gave the government "adequate notice of the basis and amount of [its] claim," *Contract Cleaning Maintenance, Inc.,* 811 F.2d at 592, and therefore did submit "claims" within the meaning of the CDA.

■ Nor has defendant persuaded that plaintiff failed to submit its claim "to the contracting officer." 41 U.S.C. § 605(a). The contract involved in this case was an implied-in-fact contract; in the typical implied-in-fact contract situation (except when related to consideration of bids), there nev-

---

**7.** The letters' failure to give plaintiff notice of his rights under the CDA (as required by 41 U.S.C. § 605(a)) is of some legal significance. The significance is not, however, what defendant suggests, i.e., that plaintiff must never have

submitted a CDA "claim." Rather, it simply means that the reply letters could not trigger the running of CDA's one-year limitations period against plaintiff. *Pathman Constr. Co. v. United States,* 817 F.2d 1573, 1578 (Fed.Cir.1987).

er would be a contracting officer designated by that title. In such a situation, all that a contractor could fairly be expected to do would be to submit its claim to the official designated by the agency for submission of that claim. Here there was uncontested testimony at trial that INS identified a particular official as "the one to determine payment." Tr. at 47. Plaintiff duly submitted its claims to that official. Accordingly, it is concluded that plaintiff satisfied CDA's requirement that claims be submitted "to the contracting officer." 41 U.S.C. § 605(a).

### 3. Decision by the Contracting Officer

■ Before this court can exercise jurisdiction over a contract claim covered by CDA, the claim must have been the subject of a contracting officer's final decision. *Conoc Constr. Corp. v. United States,* 3 Cl.Ct. 146, 147 (1983) (citing cases). Based on the reasoning set forth in section 2 above, we deem defendant's reply letters to be final decisions of the contracting officer for purposes of this requirement.

### 4. Certification

■ Defendant contends that plaintiff's claims constitute a "unitary claim" in an amount over $50,000 and thus trigger CDA's certification requirement. With respect to certification, the CDA provides:

> For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

41 U.S.C. § 605(c)(1). It is well-established that lack of proper certification, where required, deprives this court of jurisdiction to proceed on a contract claim. *Tecom, Inc. v. United States,* 732 F.2d 935, 937 (Fed. Cir.1984); *W.M. Schlosser Co.,* 705 F.2d at 1337–38; *Arlington Alliance, Ltd. v. United States,* 231 Ct.Cl. 347, 357, 685 F.2d 1353, 1359 (1982); *Skelly & Loy v. United States,* 231 Ct.Cl. 370, 372, 685 F.2d 414,

416 (1982). Moreover, where, as here, there are several claims which taken together exceed $50,000 but taken separately do not, "the claims must be carefully examined to determine whether they are separate and individual claims not requiring certification, or merely portions of a single, unified 'claim' which ... must be certified." *Walsky Constr. Co. v. United States,* 3 Cl.Ct. 615, 618 (1983).

The test for whether separate claims should be deemed "unitary" for certification purposes focuses upon whether the claims "are so related to one another that they form parts of a whole." *Walsky Constr. Co.,* 3 Cl.Ct. at 618, *quoting Warchol Constr. Co. v. United States,* 2 Cl.Ct. 384, 389 (1983). In applying this test, courts have given great weight to the manner in which a litigant treated his claims both at the agency level and in his complaint. *Black Star Security, Inc. v. United States,* 5 Cl.Ct. 110, 116–17 (1984) ("plaintiff has ... belatedly attempted to fragmentize its claim. From the ... record ... it is clear that plaintiff treated its claim as a single one until the filing of defendant's motion to dismiss"); *Palmer & Sicard, Inc. v. United States,* 4 Cl.Ct. 420, 422 (1984) ("plaintiff submitted to the contracting officer a single claim.... The letter submitting the claim stated in the first sentence that 'Our claim ... is attached with schedules'"); *Warchol Constr. Co.,* 2 Cl.Ct. at 390 (plaintiff "characteriz[ed] the damage items as part of a single claim in its amended complaint"); *Fidelity & Deposit Co. of Maryland v. United States,* 2 Cl.Ct. 137, 144 (1983) ("letters [to the contracting officer] clearly establish that plaintiff ... dealt with [its] package of demands in terms of a single claim").

In this case, plaintiff submitted fourteen separate claims to INS for the medical expenses related to fourteen different patients. No single bill exceeded $50,000. Defendant replied to these claims by sending fourteen separate denial letters. Further, in its complaint, plaintiff requested "reimbursement in the amount established by the hospital *bills* for those *fourteen*" patients for whom it had provided treat-

ment. Complaint at 3 (emphasis added). Since plaintiff did not treat its claims as unitary at the agency level or in its complaint, the instant case is distinguishable from *Black Star, Palmer, Warchol* and *Fidelity.*

Nevertheless, two judges of this court have held that

> [i]n determining whether separately stated claims are to be deemed unitary for certification purposes, neither the language employed by the contractor in making them, nor how they are organized, governs. What is vital is whether the demands arose out of essentially interrelated conduct and services, and the same or closely connected facts.

*Walsky Constr. Co.,* 3 Cl.Ct. at 619; *accord Warchol Constr. Co.,* 2 Cl.Ct. at 389. Here, defendant asserts that plaintiff's claims for the cost of fourteen patients' medical care arose out of the same facts— that there was "a close and significant relationship between the ostensibly separate claims here." Transcript of 6/22/89 Oral Argument at 13. Moreover, defendant argues,

> The dispute isn't, are we liable for the medical bills of one particular alien; it is whether we are liable for the medical bills of all 14. It is one dispute. It is one claim and it is a claim in excess of $50,000 and it requires certification.

Tr. of 6/22/89 Oral Arg. at 14–15.

Close reading of *Walsky* and *Warchol* suggests, however, that their "unitary claim" findings rested on more than a mere interrelationship of underlying facts. Both cases involved construction contracts. In *Walsky,* plaintiff's claims arose from its repair work on one ski lift. 3 Cl.Ct. at 619. In *Warchol,* plaintiff's claims "flowed from the same differing site condition." 2 Cl.Ct. at 389. In both cases, the claims were "so interrelated that separating them [would have] serve[d] only to confuse if not mislead" and therefore could "be understood and disposed of properly only if considered together, and as one." *Walsky Constr. Co.,* 3 Cl.Ct. at 619. In this case, by contrast, viewing plaintiff's separately-submitted claims as separate would neither confuse nor mislead. Further, given plaintiff's consistent treatment of its claims as separate, plaintiff cannot be accused of having "belatedly attempted to fragmentize its claim" in order to avoid the certification requirement. *Black Star Security, Inc.,* 5 Cl.Ct. at 116. Accordingly, we are not persuaded by defendant's "unitary claim" argument.

### III

For the reasons stated, defendant's motion for reconsideration or rehearing is DENIED.