In re **FRONTIER AIRLINES, INC., Frontier Leaseco One, Inc., Frontier Leaseco Two, Inc., Frontier Holdings, Inc., Debtors.**

**UNITED STATES of America, Appellant,**

v.

**FRONTIER AIRLINES, INC., Appellee.**

No. 90–K–1903.
Bankruptcy No. 86 B 8021 E.
Adv. No. 89 E 0945.

United States District Court,
D. Colorado.

Oct. 26, 1992.

---

E. Kathleen Shahan, Civil Div., Dept. of Justice, Washington, D.C., for the U.S.

Bruce W. Lane and Christian C. Onsager, Faegre & Benson, Denver, Colo., for Frontier Airlines, Inc.

## MEMORANDUM DECISION
## ON APPEAL

KANE, District Judge.

This case is before me on the government's appeal of an order by the bankruptcy court requiring it to pay interest to Frontier on Frontier's $1.38 million claim against the government under the Contract Disputes Act of 1978, 41 U.S.C.A. § 601 et seq. (1987 & Supp.1992) ("CDA"). The government claims that the bankruptcy court wrongly permitted Frontier's claim for interest under the CDA. It asserts that Frontier was not entitled to recover any interest because the Transportation Act of 1940, 31 U.S.C. § 3726 (1983 & Supp.1992), not the CDA, controlled Frontier's claim. Under the Transportation Act, Frontier would not have been able to recover any interest on its claim. For the reasons discussed below, I disagree with the government's interpretation of the pertinent statutes and therefore affirm the bankruptcy court's decision.

### I.  Facts and Procedural History

Frontier filed a chapter 11 bankruptcy petition on August 28, 1986. Until then, it had carried both government personnel and freight. To fly on Frontier a government employee would tender Frontier either a government travel request ("GTR") or a government issued credit card. Frontier, in turn, would issue an airline ticket. A government bill of lading performed the same function as a GTR when Frontier carried government air freight. Frontier either billed the government for each individual GTR/GBL or combined a number of billings on one invoice for presentation for payment.

After Frontier filed for bankruptcy protection, the government withheld $2,849,-310.43 in checks payable to Frontier and the GSA jointly. See 41 C.F.R. § 101–41.402–1(a) (1990) (requiring agencies to ensure that advance payments are not made to payees who are in bankruptcy proceedings). In November, 1987, the government filed an amended proof of claim on behalf of GSA claiming that Frontier was indebted to the government in the amount of $1,325,705.63. The various proofs of claim were, however, subject to set-off in an amended amount of $2,849,310.43. The government also filed claims on behalf of several other agencies claiming Frontier owed them an additional $83,724.77.

Frontier filed an adversary proceeding against the government on August 17, 1989, to recover both the amounts the gov-

ernment owed Frontier for tickets sold to but not paid by the United States, and interest thereon pursuant to the Prompt Payment Act, 31 U.S.C. § 3901 (1983 & Supp.1992) and the CDA. By dint of a stipulation, judgment entered against the government in a principal amount of $1,380,841.31, leaving only the propriety of interest for the bankruptcy court to determine.

On April 26, 1990, the bankruptcy court held a brief trial on the interest issue. It entered its written order on October 10, 1990. The bankruptcy court ordered the government to pay Frontier an additional $151,273.07. It also ordered the government to pay interest on the principal amounts [1] from September 15, 1986 to the date of payment. This appeal followed.

## II. Statutory and Regulatory Background

The Transportation Act of 1940, also known as the Interstate Commerce Act, amended an earlier commerce act of 1887 in a number of significant ways. The act sought to provide "for fair and impartial regulation of all modes of transportation ..." with an eye towards "the end of developing, coordinating and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce, ... and of the national defense." **Transportation Act of 1940,** ch. 72, 54 Stat. 899. In part II of Title III of the act Congress ordered the immediate payment to common carriers of U.S. mail, government property, and government personnel.[2] At all times relevant to this case, the pertinent statute provided:

A carrier or freight forwarder presenting a bill for transporting an individual or

property for the United States government shall be paid before the Administration of General Services conducts an audit.

31 U.S.C.A. § 3726(a) (1983). As in the original act, the government retained the right to deduct from future payments any amounts it subsequently determined were paid in error, or paid at an improper tariff. 11 U.S.C.A. § 3726(b). Under the pertinent regulations grown up around the act, a carrier who disputes the government's deductions must seek review within the GSA and then within the Comptroller General's office. With one exception I will discuss below, neither the statute nor the regulations allow payment of interest on the disputed amounts. Thus, a government contractor must continue to supply services or goods even if the government refuses to pay pursuant to the contract. Such is the price of doing business with the government.

Congress passed the Contract Disputes Act in 1978. **Contract Disputes Act of 1978,** Pub.L. No. 95–563, 92 Stat. 2383, (now codified at 41 U.S.C.A. § 601 et seq. (1987 & Supp.1992)). It sought to provide

a fair, balanced, and comprehensive statutory system of legal and administrative remedies in resolving Government contract claims. The act's provisions help to induce resolution of more contract disputes by negotiation prior to litigation; equalize the bargaining power of the parties when a dispute exists; provide alternative forums suitable to handle the different types of disputes; and insure fair and equitable treatment to contractors and Government agencies.

S.Rep. No. 95–1118 95th Cong.2d Sess. 1 (1978), *reprinted in* 1978 U.S.C.C.A.N.

---

1. The order provided: "the Defendant is obligated to pay Frontier the additional sum of $151,-273.07. Frontier is further entitled to receive interest on the net sum payable (the total payable less all agreed or determined offsets) from September 15, 1986 to the date of payment, calculated at the rate and in the manner specified in 41 U.S.C. § 611." *Opinion and Order of October 10, 1990* at 12.

2. "Payment for transportation of the United States mail and of persons or property for or on

behalf of the United States by any common carrier ... shall be made upon presentation of bill thereof, prior to audit or settlement by the General Accounting Office, but the right is hereby reserved to the United States Government to deduct the amount of any overpayment to any such carrier from any amount subsequently found to be due." **Transportation Act of 1940,** ch. 722, § 322, 54 Stat. 955 (current version at 31 U.S.C.A. § 3726 (1983)).

5235. The CDA's scope of applicability is deceptively straight-forward. Under § 602(a)(2), the act "applies to any express or implied contract ... entered into by an executive agency for the procurement of services." The act does not apply to TVA contracts or contracts with a foreign government or international agency. § 602(b), (c).

Disputes are initially resolved informally. A contractor must put its claim in writing and must submit it to a "contracting officer" for resolution. § 605(a). The contracting officer makes a written order and decision in a short period of time. *Id.* The contractor can appeal the written decision to the agency board of contract appeals, and then to the United States Court of Appeals for the Federal Circuit, § 607(g)(1)(A), or file an action in the claims court. § 609(a)(1); 28 U.S.C. § 1491(a)(2). Important to the resolution of this appeal is § 611. It provides that "[interest] on amounts found due contractors shall be paid to the contractor from the date the contracting officer receives the claim pursuant to section 605(a) of this title from the contractor until payment thereof."

Finally, I must take note of the **Prompt Payment Act of 1983**, Pub.L. No. 97–452, § 1(18)(A), 96 Stat. 2474 (now codified at 31 U.S.C.A. § 3901 et seq. (1983 & Supp.1992)) ("PPA"). It provides for interest penalties against a federal agency which does not pay a business concern for each complete delivered item of property or service by the required payment date. § 3902. Section 3906 permits a claimant under the PPA to file its claim under the CDA and for the claim to accrue interest for up to one year. Thereafter, the CDA's penalty provisions apply.

### III. The Claims of the Parties

The government claims that the Transportation Act and its regulations provide the exclusive procedures for resolving disputes regarding contracts for transportation services. This case, however, is more about interest on principal than about principles of procedural propriety. The heart of the government's position is that to approve the CDA procedure in this case is to repeal by implication certain provisions of the Transportation Act. Not surprisingly, the government finds nothing in the legislative history of the CDA and the Transportation Act that would support such a repeal by implication. Absent such a repeal, it asserts there can be no waiver of sovereign immunity and hence no payment of interest. In the alternative, the government argues that even if the CDA does apply to these facts, Frontier never submitted a "claim," to a "contracting officer," "for a decision" within the strictest meaning of the CDA.

Frontier claims that the plain meaning of the CDA makes it applicable to these facts. It further asserts that the Transportation Act's implementing regulations specifically contemplate application of the CDA to claims for interest under the Prompt Payment Act.[3] It argues that it would be illogical to have to proceed under the Transportation Act to recover the principal amounts owed and under the CDA for PPA penalties. It thus suggests that the CDA should apply to all claims under the Transportation Act.

Assuming the CDA does apply to this case, Frontier asserts that its invoices became claims because the government failed to pay the invoices in a reasonable period of time; because Frontier supplemented the invoices with repeated demands for payment and for interest; and because the government disputed its liability for interest. Frontier also claims the government's present position is inconsistent in many respects to positions it took at trial and in other ancillary proceedings.

### IV. Discussion

■ While the conclusion is not with-

---

**3.** "Interest penalties under the Prompt Payment Act are not required when payment is delayed because of a disagreement between a Federal agency and a carrier or forwarder over the amount of the payment or other issues. Claims concerning any interest that may be payable will be resolved in accordance with the provisions of the Contract Disputes Act...." 41 C.F.R. § 101–41.604–2(b)(6) (1990).

out doubt[4], I find that CDA does apply to Frontier's claim against the government. I acknowledge that courts disfavor repeals by implication and should find them only where Congress has expressed its intent to repeal. *United States v. Fausto*, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988). Against this, I must balance the rule that where Congress' language is clear, the court's job is to give " 'effect to the unambiguously expressed intent of Congress.' " *Norfolk & Western Railway Co. v. American Train Dispatchers Association*, —— U.S. ——, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) *quoting Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

■ I cannot ignore the explicit language of the CDA itself. Section 602 could not be much clearer: "Unless otherwise specifically provided herein, this chapter applies to any express or implied contract ... entered into by an executive agency...." The only exceptions "specifically provided" by the statute involve the Tennessee Valley Authority and foreign governments and international organizations.

Furthermore, when I look at the PPA and the CDA together, they form a seamless and comprehensive approach to dilatory governmental payment practices. The PPA applies to interest claims for the first year and the CDA thereafter. In passing these two statutes, Congress intended a dramatic and sweeping effect on the procurement and payment process.

> The Contracts Disputes Act of 1978 provides a fair, balanced, and comprehensive statutory system of legal and administrative remedies in resolving Government contract claims.

S.Rep. No. 95–1118, 95th Cong.2d Sess. 1 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235. The PPA especially recognized the deleterious effect governmental intransigence has on both the contractors and the government itself.

> The purposes of H.R. 4709 is to accomplish what administrative rules and regulations have failed to do—provide incentives for the Government to pay its bills on time. Those suppliers of goods and services who do business with the Government ... are being treated unfairly by the Government when it fails to pay its bills on time. ... The government itself is also hurt because its reputation as a slow payer discourages businesses from bidding for Government contracts. The Government consequently is deprived of the innovation and lower prices that result from vigorous competitive bidding for contracts.

H.Rep. No. 97–461, 97th Cong.2d Sess. 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 111. In the absence of specific language to the contrary, I accordingly find that the CDA is applicable to the tickets, vouchers and contracts in the case before me.

I find further support for my conclusion in the regulations passed to interpret the Transportation Act. As noted above, "[c]laims concerning any interest that may be payable will be resolved in accordance with the provisions of the Contract Disputes Act of 1978." 41 C.F.R. § 101–41.-604–2(b)(6). I cannot reconcile this language with the government's position that all disputes must be handled through the Transportation Act. Were that true, as Frontier correctly points out, an airline's claim for interest under the PPA would proceed under the CDA procedure while the underlying ticket claim would proceed under the Transportation Act. I find nothing in the two acts to suggest that Congress intended such a bifurcated and cumbersome approach. Indeed, just the opposite is true.

■ I also find that the Frontier invoices were claims for payment consistent with

---

**4.** This case is one of first impression at both the district and circuit court levels. Only a handful of administrative agencies have considered the issue with inconsistent results. *Compare Port Arthur Towing Co., Inc., v. Inc.,* 89–3 B.C.A. ¶ 22,004, A.S.B.C.A. No. 37516 (1989) (maritime contract resolved under the CDA, not the Interstate Commerce Act), *with Burlington Air Express, Inc.,* 90–2 B.C.A. ¶ 22,708, A.S.B.C.A. No. 39168 (1990) (freight forwarder's claim for money withheld by the government was not within the contract board of appeals' jurisdiction because the contract was a transaction under the Interstate Commerce Act).

the CDA. 48 C.F.R. Ch. 1 § 33.201 supplies the following definition of a "claim:"

> **Claim** means a written demand or written assertion by one of the contracting parties seeking ... payment of money in a sum certain.... A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim. The submission may be converted to a claim, by written notice to the contracting officer ..., if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

Under this definition, an invoice becomes a claim upon a demand in writing to the contracting officer, but only if the claim is disputed as to liability or amount, or if the contracting officer does not act on the invoice in a reasonable period of time. There must be both a written demand and a dispute or a failure to act within a reasonable period of time. The point of these provisions is to provide orderly notice to the government that a dispute exists, not to create additional hurdles and hoops to be jumped through needlessly. *See generally, City of El Centro v. United States,* 17 Cl.Ct. 794 (1988), *rev'd on other grounds,* 922 F.2d 816 (Fed.Cir.1990).

Frontier satisfied both conditions. It wrote numerous letters to the GSA and the Department of Justice demanding payment of both the principal and the interest at stake. The government refused to pay. Furthermore, the government did not act within a reasonable period of time. Instead, it waited nearly three and one half years before paying the bulk of the principal owed to Frontier.

Nor am I persuaded by the government's argument that since there was no designated contracting officer, Frontier could not, ipso facto, have complied with the CDA because there was no one to whom it could submit its claim. The government's argument misses the point of requiring a claimant to submit a claim to a contracting officer.

A contracting officer is one who has "the authority to enter into, administer, or terminate contracts and make related determinations and findings. Contracting officers may bind the Government only to the extent of the authority delegated to them." 48 C.F.R. § 1.602–1. By requiring that a claim be submitted in writing to the contracting officer, the regulations again ensure that a written notice of the claim will be directed to the person or persons with the authority and expertise to consider and process the claims. *El Centro,* 17 Cl.Ct. at 800–01.

Here, Frontier made its written demands to both the GSA and to the Department of Justice lawyers representing the government in the post-petition proceedings. No other agencies or individuals had any greater knowledge or authority after Frontier filed for bankruptcy protection. Accordingly, I find that Frontier satisfied the notice requirements of the CDA when it made repeated written demands to the GSA and the DOJ and when the government did not then and there pay.

Finally, I must take note of the many inconsistencies in the government's position in this appeal. First, the government never argued at the trial level that the invoices and letters Frontier sent to the government were not "claims." Second, in its trial response brief, it admitted that had Frontier not filed for bankruptcy protection, Frontier could have sued under the PPA for penalty interest. "Either the procedures in the CDA for interest payments or contained in the Transportation Act and its regulations for the transportation billing claims would dictate." Third, in the bankruptcy court, the government never disputed that the DOJ was the authorized representative of the government for the submission of a CDA claim. Fourth, at the trial level, the government expressly argued that all of Frontier's invoices were disputed because of the bankruptcy filing. In this court, however, the government claims that the vast majority of the invoices were undisputed. Obviously, the earlier position made the PPA penalty interest payments inapplicable. Concomitantly, however, if the government disputes the invoices, the position weakens its view that the Transportation Act provides a unified and comprehensive resolution procedure.

Finally, in an ancillary proceeding now pending before the United States District Court for the District of Columbia, the government argued that the GAO has no constitutional authority to review carrier disputes pursuant to 31 U.S.C. § 3726(g). Here, however, the government suggests, in discussing the procedures under the Transportation Act, that carriers can ask the GAO to review actions taken by the GSA, again suggesting the unitary nature of the Transportation Act procedures.

I mention these inconsistencies not to be critical of the government's attempts to protect the public fisc. Rather, they are significant to me because they demonstrate that the government's interpretations turn more on concern for dollars than for accurate interpretation of the statutes and regulations.

The judgment of the bankruptcy court is accordingly affirmed.